OPINION OF THE COURT
Martin E. Ritholtz, J.
“[A]nd [he] shall cause him to be thoroughly healed” (Exodus 21:19).
“It is best that He who has given life, shall take it away; no one may hasten his death.” (Tractate Avodah Zar ah 18a.)
“Never will I give a deadly drug, not even if I am asked for one, nor will I give any advice tending in that direction.” (Hippocratic oath.)
Is there a procedure in effect in Queens County to facilitate an emergency application on a court holiday or weekend, when the Civil Term of the Supreme Court is closed? Can a health care agent with authority to make health care decisions, pursuant to a duly executed proxy, prevent the immediate surgical insertion of a percutaneous gastric feeding tube?
These questions confronted the court this past Presidents’ Day, and were resolved by the use of some innovative procedures.
Background
On February 21, 2005, Presidents’ Day, at about 1:30 p.m., I received a telephone call at my home from Samuel A. Abady, Esq. seeking an emergency application concerning an alleged “life threatening” situation. My first reaction was to refer him to the Arraignment Part at the Kew Gardens courthouse where an Acting Supreme Court Justice presides. However, any efforts to contact the Part proved futile, as it later appears that said Part had been flooded on that date and was temporarily relocated. Counsel persisted, and requested that he forward to me by e-mail the proposed order to show cause in lieu of notice of petition, verified petition, supporting affirmations, affidavits and exhibits for my immediate consideration. Under the circumstances, I acquiesced, and within minutes I was able to peruse the 46 pages e-mailed to me.
The Verified Petition and Emergency Relief Requested
According to the verified petition, the following is the factual situation which confronted me. The subject of this proceeding, Lee Kahan (nee Friedland), is 86 years old and resides at the re *483 spondent West Lawrence Care Center, a nursing home in Far Rockaway, New York. Her husband died in 1984, and she has two children: respondent Joan Simonson, who resides in Milford, Connecticut, and a son, Martin Kahan, who resides in Florida. Mrs. Kahan has a history of chronic heart failure, and, on June 8, 1998, before she underwent five different cardiac procedures at St. Francis Hospital, she executed a health care proxy, before two witnesses, appointing her daughter, respondent Joan Simonson, to be her health care agent. Paragraph 2 of said proxy provided: “If there is any hope of recovery, I want my agent to ask for life sustaining treatment.”
Mrs. Kahan was later diagnosed with Alzheimer’s dementia and, on March 17, 2003, Leon D. Alpern, C.PA., a former partner of her deceased husband, who managed her affairs pursuant to a durable power of attorney, had her admitted to the Birchwood Nursing Home in Huntington Station, New York. The petitioner herein, Rose Borenstein, a sister of Mrs. Kahan, had been actively involved in her medical care, taking her to doctors, and visiting her in the hospital and nursing home. Said petitioner and her siblings sought to have Mrs. Kahan transferred to a nursing home near them in Far Rockaway, so as to provide her with better care, and so that they would be able to visit her regularly, whereas in Birchwood Nursing Home, she had been virtually isolated. When respondent, Joan Simonson invoked her alleged powers under the health care proxy to prevent such transfer, Mr. Alpern petitioned the Supreme Court, Suffolk County, under index number 15226/04, and on October 22, 2004 was appointed a special coguardian (along with his partner Richard Terris) of the property of Mrs. Kahan, who was deemed an incapacitated person, pursuant to article 81 of the Mental Hygiene Law. Inter alia, Honorable Roger Bohrer provided that Mrs. Kahan be relocated, in the discretion of the special co-guardians, to an appropriate facility “so as to facilitate visitation by family members.”
Mrs. Kahan arrived on January 18, 2005 at the respondent West Lawrence Care Center. Suffering from advanced dementia, pneumonia, pulmonary edema, a urinary tract infection and other problems, on January 29, 2005 Mrs. Kahan was admitted to St. John’s Episcopal Hospital in Far Rockaway. Upon her admission, a nasogastric tube was inserted to provide hydration and nutrition because she could not be fed by mouth. Her treating geriatrician, Dr. Daniel Buff, recommended that she be given a percutaneous endoscopic gastrostomy (PEG) tube, since a na *484 sogastric tube is a temporary measure, and if allowed to remain over an extended period, infection and aspiration are increasingly potential lethal risks to her health. The respondent, Joan Simonson, exercising her authority under the health care proxy, refused to authorize the insertion of a PEG tube. As a result, Mrs. Kahan was discharged back to the respondent West Lawrence Care Center, and has continued to receive hydration and nutrition via the nasogastric tube for over three weeks, at the time of this application.
Annexed to the petition is an affirmation dated February 19, 2005, submitted by Dr. Jane Watson, licensed to practice medicine in New York and board certified in internal medicine, in support of the emergency application for immediate surgery to insert the PEG tube. According to Dr. Watson, “insertion of a PEG tube is a simple surgical procedure that causes little risk, but is vitally necessary.” She further asserts that “aspiration is a common event with a nasogastric tube, and the longer one is inserted, the more likely it is that the patient will aspirate,” which is a “potentially lethal event in any patient, but especially in a debilitated, elderly patient.” Dr. Watson also claims that a nasogastric tube enables infection to penetrate from the outside to the interior of the patient’s respiratory tract, which poses a potentially lethal risk to the health of Mrs. Kahan. In contrast, Dr. Watson contends that a PEG tube does not present these risks, and is “considered optimal care for patients in Mrs. Kahan’s condition.”
The petitioner contends that the signed health care proxy of June 8, 1998 specifically excluded decisions relating to artificial nutrition and hydration, since Mrs. Kahan never had revealed her wishes regarding such treatment, as required by said health care proxy.
Accordingly, the specific relief requested in the petition is: (a) pursuant to Mental Hygiene Law § 81.02 (a), to appoint the petitioner, Rose Borenstein, the health care special needs guardian and guardian ad litem for her sister, Lee Kahan, a permanently incapacitated person, so as to empower her to authorize the immediate surgical insertion of a PEG tube; (b) pursuant to Public Health Law § 2992, to void the health care proxy held by respondent, Joan Simonson, or alternatively, to declare that said respondent is without power to make decisions about artificial hydration and nutrition for Lee Kahan; (c) to enjoin respondent, Joan Simonson, from interfering with health care decisions about artificial hydration and nutrition for Lee Ka *485 han; and (d) to immediately order respondent West Lawrence Care Center to transfer Lee Kahan to St. John’s Episcopal Hospital for the insertion of a PEG tube.
Emergency Service Provisions and Immediate Temporary Injunctive Relief
Upon review of the e-mailed papers, I contacted counsel for the petitioner, and provided for service of the order to show cause in lieu of notice of petition upon the respondents by fax and by overnight courier, along with telephone notice to both respondents, and also provided for notice to Martin Kahan in Florida, Leon Alpern, and Richard Terris. I ordered that respondent West Lawrence Care Center immediately transfer Lee Kahan to St. John’s Episcopal Hospital, and scheduled a hearing in my chambers for the next day, February 22, 2005 at 11:30 a.m. Counsel for the petitioner was instructed to purchase an index number and request for judicial intervention (RJI) from the County Clerk, on February 22, 2005 at 9:30 a.m., to allow for the order to show cause to be recorded, entered, and become subject to later enforcement proceedings. On February 21, 2005, at 5:35 p.m., I received an e-mail from Mr. Abady, confirming service of the papers, and indicating how respondent Joan Simonson was also sent an e-mail copy of all the papers to enable her to immediately read the contents of the petition, and if so advised, seek the assistance of counsel.
The Hearing
On February 22, 2005, a hearing was held in my chambers, as scheduled, in the presence of the petitioner, Rose Borenstein, her counsel, Mr. Abady, respondent West Lawrence Care Center by its counsel, Barbara S. Phair, Esq., and with respondent Joan Simonson, appearing pro se by telephone from her home in Milford, Connecticut. Also present were Harold Friedland and Sophie Friedland, siblings of Lee Kahan. The presence of Lee Kahan was dispensed with pursuant to Mental Hygiene Law § 81.11 (c) (2), since it was conceded that Mrs. Kahan is an incapacitated person suffering from end-stage Alzheimer’s dementia, who “is completely unable to participate in the hearing,” and who had just been transferred from respondent West Lawrence Care Center to St. John’s Episcopal Hospital, in accordance with my emergency order of February 21, 2005.
Petitioner Rose Borenstein testified first, and essentially reiterated what she set forth in the verified petition. When asked *486 what her sister, Lee Kahan’s moral and religious view was, she described how in 1996, upon retirement, Mrs. Kahan progressively became more traditional in the observance of Judaism, and was a “partner in Torah” with Mrs. Sheila Brecher for four years. According to a letter written by Mrs. Brecher, admitted into evidence as petitioner’s exhibit 1, Mrs. Kahan “enjoyed studying about traditional Judaism” and “wanted very much to increase her knowledge of and commitment to traditional Judaism.” In the final paragraph of said letter, Mrs. Brecher writes: “Lee and I discussed the Jewish view of death. She expressed a strong desire to be buried in the Orthodox manner that her husband, may he rest in peace, was buried.” The petitioner Rose Borenstein further testified that based upon everything she knows about her sister, “including her evolved commitment to traditional or religious Judaism . . . she would ... if she could express her wishes . . . opt for the optimal life-sustaining treatment so she could live as long as possible, even though prolonged life could be a burden,” and would not opt for passive euthanasia, i.e., a suboptimal treatment that could hasten her death. She then described how the nasogastric tube keeps getting clogged, or comes out of Mrs. Kahan’s nose, and when reinserted causes obvious pain. Notwithstanding the objection of respondent Joan Simonson to the recommendation of the treating doctors that a PEG be immediately inserted, Rose Borenstein petitions herein that her sister, Lee Kahan, would have wished to have the lifesaving procedure done.
The next two witnesses were Mrs. Kahan’s brother, Harold Friedland, and sister, Sophie Friedland, who both in brief testimony unequivocally supported the petition.
Ms. Phair on behalf of the respondent West Lawrence Care Center did not oppose the petition, and expressed her client’s position that it was “willing to accept whatever judgment is made as far as her care.”
The respondent Joan Simonson not only participated in cross-examination of the petitioner, but also testified on her own behalf. She first dispelled any doubts as to her mother’s capacity to execute the subject health care proxy in June of 1998, testifying that she did not have Alzheimer’s at that time, and possessed all her mental faculties. Mrs. Simonson did, however, concede that her mother never specifically expressed her wishes about artificial nutrition and hydration. Nevertheless, she opposes the petition based on her own independent research that the insertion of a PEG tube would “actually be more harmful” to her mother. Referring to her mother, Mrs. Simonson attested,
*487 “she has almost no quality of life. My whole concern is that ... I mean, she is dying. This is advanced Alzheimer’s. It’s fatal. My whole concern is that she not be caused any suffering and that she be able to live out the rest of her natural life, you know, as comfortably as possible.”
She also testified regarding a long conversation she had with a treating physician, Dr. Larsen, who, “speaking not as a medical doctor, said I think it’s a sin to keep someone alive like this.” When asked if she favors euthanasia, she denied wanting to do “anything that would cause my mother to die.” Mrs. Simonson also expressed her concern that artificial nutrition and hydration might be unnecessary, and that a “swallowing test” should be performed to see if her mother can eat without any artificial assistance. She concluded her testimony, by emphasizing that “I made my decision based only on what I felt and was told was in her mother’s best interest,” and that she would withdraw any objections if the medical testimony clearly indicated that the PEG procedure was necessary.
Although the court initially planned to resume the hearing the next day on February 23, 2005 at St. John’s Episcopal Hospital, it became apparent that Dr. Larsen would not be available, since she was scheduled to leave for Florida. With the assistance of Ms. Phair, a telephone hearing was scheduled for that same afternoon, February 22, 2005, at 4:00 p.m., at which time Mrs. Kahan’s treating physicians Dr. Larsen and Dr. Shestak would be able to testify. Although Mr. Abady was physically present in chambers along with the court, his client, petitioner Rose Borenstein, Ms. Phair, respondent Joan Simon-son, and the two doctors were able to participate in the hearing via telephone conference on a speaker phone, recorded by an official court reporter, as was done in the morning session. Dr. Metta Larsen, who is board certified in family practice, testified that she was the attending physician in charge of Mrs. Kahan’s care while she’s been a resident at the respondent nursing home. She fully agreed with the aforementioned diagnosis and conclusions set forth by Dr. Jane Watson, in her affirmation, dated February 19, 2005, which was annexed to the petition. In essence, the PEG insertion procedure is medically indicated immediately if Mrs. Kahan is unable to eat on her own, since the nasogastric tube is a temporary measure, with potential life-threatening consequences if prolonged, as in this instance. Mr. Abady questioned Dr. Larsen regarding certain medical journal articles obtained via the Internet, which respondent Simonson *488 relied, upon as a basis for her objections to the PEG procedure. The court made it clear that unless respondent Simonson would produce expert medical witnesses who supported her position, this hearing would not degenerate into a “Google trial.” Notwithstanding the continuing debate in the medical literature concerning the survival rate of nursing home patients with end-stage dementia when fed by a PEG, Dr. Larsen confirmed that an overwhelming majority of patients in that condition can be expected to live for at least a year and possibly many years.
Thereafter, Dr. Aleksandr Shestak, board certified in internal medicine, testified that he is an attending physician at St. John’s Episcopal Hospital, treating Mrs. Kahan. He specifically recalled two conversations he had with respondent Simonson, over a week before the date of the hearing, when he informed her that it was important for her mother to have a stomach feeding tube inserted at that time. On those two separate occasions, respondent Simonson refused to permit the PEG insertion procedure, despite his recommendation for same. Dr. Shestak further testified that since Mrs. Kahan is presently unable to swallow, she is not a candidate to undergo the “swallowing test,” and needs an immediate PEG placement for all the reasons set forth by Dr. Watson and Dr. Larsen.
At this point of the hearing, when asked if a continued bedside hearing was necessary for the next day to hear Dr. Buff, respondent Simonson withdrew her objection to the procedure, and indicated that she would immediately execute any written consent form that the hospital required.
Since the petition sought not only immediate emergency relief, but also requested a permanent injunction, inter alia, declaring the health care proxy held by respondent Simonson null and void, or alternatively enjoining said respondent from interfering with any future health care decisions affecting Mrs. Kahan regarding artificial hydration and nutrition, the court felt the need to set forth its findings and conclusions in the within detailed memorandum, notwithstanding the issuance of an order and judgment on February 24, 2005.
It is to be noted that Mrs. Kahan underwent the PEG surgery on February 24, 2005 successfully, and has presently returned to the care of respondent West Lawrence Care Center.
*489 Legal Analysis
(a) Procedure for Emergency Applications Made After Court Hours
CPLR 2212 (b) provides that an ex parte application in a Supreme Court action “may be made at a motion term or to a justice out of court in any county in the state.” (Emphasis added.) According to Professor Siegel, “[t]he legitimate aim of this provision is to afford maximum convenience to urgent applications” (Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C2212:9, at 63). In Queens County, to facilitate such emergency applications on court holidays or weekends when the Supreme Court is closed, an internal memorandum prepared by the Administrative Law Judge, dated July 8, 2003, was circulated to the justices. It was noted therein that an acting justice presides in the Criminal Court Arraignment Part at night, on court holidays, or on a weekend, and can deal with such applications, but any justice away from court may also be approached. When presented with such an application, a justice should: (1) determine whether a related action or proceeding has been commenced in another jurisdiction, or whether the application has previously been made in another jurisdiction. If so, to the extent practicable, the applicant should be advised to present the application in that jurisdiction, and (2) examine the application carefully to ascertain whether the claim is truly urgent, otherwise the applicant should be directed to present the application in court on the next business day for processing in the usual fashion.
In the event it is determined that the matter is urgent, and the proposed order is signed, the applicant should be directed in said order to purchase an index number and an RJI from the County Clerk, at the earliest possible moment, within a certain specified time on the next business day, otherwise the order would be rendered null and void.
As noted at the beginning of this memorandum, the court adhered to this procedure, and was able to complete the entire hearing on the next business day and reach an immediate resolution relating to the emergency.
(b) Genesis of the Health Care Proxy Law
In 1914, Judge Benjamin N. Cardozo declared that: “Every human being of adult years and sound mind has a right to determine what shall be done with his own body.” (Schloendorff *490 v Society of N.Y. Hosp., 211 NY 125, 129 [1914].) The New York Court of Appeals has expressly recognized that patients have the right to refuse treatment (Matter of Eichner v Dillon, 52 NY2d 363 [1981]), and that the right is protected under the Due Process Clause of the State Constitution (see Rivers v Katz, 67 NY2d 485 [1986]). In its 1981 Eichner decision, the Court of Appeals announced that life-sustaining treatment may be withheld or withdrawn from an incompetent patient if there is “clear and convincing evidence” that the patient, when competent, expressed a desire to forgo such measures (Eichner at 379). In that case, the Court held that the wishes of the patient, Brother Joseph Fox were to be respected, since he had made “solemn pronouncements” that he did not want to be maintained in a vegetative coma by use of a respirator (id. at 380). In the companion case, Matter of Storar (52 NY2d 363 [1981], cert denied sub nom. Storar v Storar, 454 US 858 [1981]), the Court found that because the mentally retarded Storar had never been competent so as to be able to make reasoned decisions regarding medical treatment, his mother could not possibly determine what his preferences would be.
In 1987, the Appellate Division, Second Department, in Matter of Delio v Westchester County Med. Ctr. (129 AD2d 1 [1987]), held that the wife of a patient in a persistent vegetative state, as conservator, was entitled to act in accordance with the patient’s wishes to discontinue the use of feeding and hydration tubes, since there was clear and convincing evidence that Daniel Delio, while competent, had expressed his desire to close family members not to have his life sustained by artificial means under these circumstances. The Court concluded that nutrition and hydration should not be distinguished from other forms of life-sustaining medical treatment. (See Delio v Westchester County Med. Ctr., supra at 19.)
In 1988, the New York Court of Appeals, in the decision of Matter of Westchester County Med. Ctr. (O’Connor) (72 NY2d 517 [1988]), advanced a more rigid approach for effectuating the treatment preferences of incompetent patients than the approach articulated in Storar and Eichner. Rather than accepting general evidence of the patient’s wishes regarding life-sustaining treatment, the Court required findings of a specific subjective intent as to the exact procedure in question involved before allowing it to be withdrawn. In the O’Connor case, the daughters of Mary O’Connor, an incompetent elderly woman, refused to permit doctors to insert in their mother a nasogastric feeding *491 tube needed to provide nutrition and hydration. The Court of Appeals concluded that the proof was not clear and convincing that the patient had made a firm and settled commitment, while competent, to decline the prescribed type of medical assistance under the circumstances like those presented. In a nutshell, the Court of Appeals proclaimed:
“Every person has a right to life, and no one should be denied essential medical care unless the evidence clearly and convincingly shows that the patient intended to decline the treatment under some particular circumstances . . . This is a demanding standard, the most rigorous burden of proof in civil cases . . . It is appropriate here because if an error occurs it should be made on the side of life.” (Matter of Westchester County Med. Ctr. [O’Connor], supra at 530-531.)
Despite evoking a stringent standard, the O’Connor court noted that through creation of a “springing power of attorney,” a principal could invest another person with authority to express the principal’s wishes with respect to medical treatment (Matter of Westchester County Med. Ctr. [O’Connor], supra at 528 n 2). The Court further suggested that “[t]he ideal situation is one in which the patient’s wishes were expressed in some form of a writing . . . while he or she was still competent.” (Matter of Westchester County Med. Ctr. [O’Connor], supra at 531.)
Before the New York Health Care Agents and Proxies Law was enacted in answer to the call of O’Connor, two more decisions impacted on its genesis. In Elbaum v Grace Plaza of Great Neck (148 AD2d 244 [1989]), the Appellate Division, Second Department, reversed a lower court ruling, which, in the face of unrefuted evidence that Jean Elbaum, when competent, had expressed to her close family that she would not want the use of feeding tubes if she were in an irreversible vegetative state, denied the conservator’s application to have a gastrointestinal feeding tube removed. The Appellate Division reversed the Nassau County Supreme Court decision, finding that there was clear and convincing proof that the conservatee, while competent, would have declined artificial treatment under her present circumstances.
The United States Supreme Court in Cruzan v Director, Mo. Dept. of Health (497 US 261 [1990]) found that a competent person has a constitutionally protected liberty interest in refusing hfe-sustaining nutrition and hydration. However, the Court *492 determined that, where a patient like Nancy Beth Cruzan is incompetent, it is constitutionally permissible for a state to require clear and convincing evidence of the patient’s prior wishes concerning the withholding or withdrawing of life-sustaining medical treatment before such wishes can be effectuated. The United States Supreme Court affirmed the judgment of the Missouri Supreme Court which held that the testimony adduced at trial did not amount to clear and convincing proof of Nancy Cruzan’s prior desire to have a gastrostomy feeding tube removed in her persistent vegetative state. Justice O’Connor, in a concurring opinion, stated:
“Few individuals provide explicit oral or written instructions regarding their intent to refuse medical treatment should they become incompetent. States which decline to consider any evidence other than such instructions may frequently fail to honor a patient’s intent. Such failures might be avoided if the State considered an equally probative source of evidence: the patient’s appointment of a proxy to make health care decisions on her behalf. Delegating the authority to make medical decisions to a family member or friend is becoming a common method of planning for the future.” (Cruzan v Director, Mo. Dept. of Health, supra at 289-290.)
Six days after the Court announced its decision in Cruzan, the New York State Legislature passed the Health Care Agents and Proxies Law, article 29-C of the Public Health Law, which came into effect on January 18, 1991. When Governor Cuomo signed this bill on July 22, 1990 he declared: “The United States Supreme Court’s recent landmark ruling in Cruzan . . . charged states with the responsibility to craft policies for critical treatment decisions on behalf of incompetent patients. The health care proxy bill is this State’s dramatic step toward fulfilling that responsibility.” (Governor’s Mem approving L 1990, ch 752, 1990 McKinney’s Session Laws of NY, at 2742.)
(c) The Health Care Agents and Proxies Law and Artificial Nutrition and Hydration
As noted in the Memorandum in Support of the Health Care Agents and Proxies Law, submitted by the Medical Society of the State of New York: “Society has not yet resolved the issue of nutrition and hydration as being regarded as either aggressive medical treatment or supportive humanistic care. Even within the medical community, the debate continues as to the *493 role of nutrition and hydration” (see Bill Jacket, L 1990, ch 752, at 109).
For many, artificial nutrition and hydration, administered through a PEG, is another form of medical treatment, similar to mechanical ventilation. (See e.g. American Academy of Neurology, Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient, 39 Neurology 125 [1989]; Delio v Westchester County Med. Ctr., supra at 19.)
For others, the administration of artificial nutrition and hydration is not a medical procedure, but the act of providing sustenance to a living person. As has been pointed out:
“With a respirator, the person can spontaneously begin breathing. There is the possibility of weaning a person from a respirator, even one in a coma or [persistent vegetative state]. There is no such possibility with artificial means of supplying nourishment . . . Another difference lies in the accessibility. If you do not make the patient’s diaphragm work, at least the air is right there for him to breathe should he be able to do so on his own, even if he is unconscious. Not so with food. The patient does not live in an environment of food, ready for intake should his spontaneous bodily apparatus start drawing it in. It must be supplied, and in this regard ceasing to provide nutrition and hydration takes on more the flavor of denying the patient air, not just assistance in breathing.” (Stephen J. Heaney, ‘You Can’t Be Any Poorer Than Dead’: Difficulties in Recognizing Artificial Nutrition and Hydration as Medical Treatments, 61 Linacre Q 77, 85 [May 1994]; also see Patrick Derr, Why Food and Fluids Can Never he Denied, 16 Hastings Center Rep 28, 29 [Feb. 1986].)
Those who distinguish nutrition and hydration from other forms of medical treatment note that withdrawal of this form of support is frequently an independent cause of death by “gradual starvation and dehydration,” and not from the underlying disease. (See Washington v Glucksberg, 521 US 702, 746 [1997, Stevens, J., concurring] [also used as concurring opinion in Vacco v Quill, 521 US 793, 809 (1997)]; Edward R. Grant and Chuck D. Forsythe, The Plight of the Last Friends: Legal Issues for Physicians and Nurses in Providing Nutrition and Hydration, 2 Issues L & Med 277, 280 [1987].)
*494 It appears that in the original legislation proposed by the New York State Task Force on Life and Law, which had been convened by Governor Cuomo, artificial nutrition and hydration was not singled out from other forms of life-sustaining medical procedures. (See Jill Hollander, Health Care Proxies: New York’s Attempt to Resolve the Right to Die Dilemma, 57 Brook L Rev 145, 168 [1991].) However, opposition to the original legislation by such groups as the Greater New York Health Care Facilities Association contended that the proposed bill did not provide for adequate safeguards with respect to the potential withholding and withdrawal of tube-delivered nutrition and hydration (Bill Jacket, L 1990, ch 752, at 124-132). The net result was a last minute legislative compromise which, in effect, limits the health care agent’s broad power to decide what is in the principal’s best interests when dealing with artificial nutrition and hydration (see Christopher C. Angelí, Outside Counsel, Health Care Proxies: Practical Considerations, NYLJ, Aug. 27, 1990, at 1, col 1). The enacted statute provides that the principal’s preferences regarding artificial nutrition and hydration must be specified before his or her agent is deemed to have the authority to decide these questions (Public Health Law § 2982 [2] [b]). New York’s statute is similar to those sister state statutes which provide that if a patient does not clearly indicate in an advanced directive that nutrition and hydration are to be withheld or withdrawn, nutrition and hydration must be provided (see 63 Am Jur Trials, Withdrawal of Nutrition and Hydration, § 11 n 70).
(d) Lee Kahan’s Health Care Proxy and the Administration of Artificial Nutrition and Hydration
The instant petition involves a duly executed health care proxy, and specifically deals with a request for emergency treatment in the nature of artificial nutrition and hydration.
Sections 2981 (4) and 2983 of the Public Health Law empower the agent pursuant to a proxy to make health care decisions for the principal upon determination by an attending physician that the principal lacks the capacity to make these decisions for himself or herself. Section 2982 (2) of the Public Health Law sets forth the “decision-making standard,” as follows: .
“After consultation with a licensed physician . . . the agent shall make health care decisions: (a) in *495 accordance with the principal’s wishes, including the principal’s religious and moral beliefs; or (b) if the principal’s wishes are not reasonably known and cannot with reasonable diligence be ascertained, in accordance with the principal’s best interests; provided, however, that if the principal’s wishes regarding the administration of artificial nutrition and hydration are not reasonably known and cannot with reasonable diligence be ascertained, the agent shall not have the authority to make decisions regarding these measures.” (Emphasis added.)
Section 2981 (5) (d) of the Public Health Law includes a suggested form, but does not mandate its use. The subject health care proxy adopts said form’s language, as follows:
“(1) I, Lee Kahan hereby appoint Joan Simonson as my health care agent to make any and all health care decisions for me, except to the extent that I state otherwise. This proxy shall take effect when and if I become unable to make my own health care decisions.
“(2) Optional instructions: I direct my proxy to make health care decisions in accord with my wishes and limitations as stated below, or as he or she otherwise knows. If there is any hope of recovery, I want my agent to ask for life sustaining treatment. (Unless your agent knows your wishes about artificial nutrition and hydration [feeding tubes], your agent will not be allowed to make decisions about artificial nutrition and hydration.)” (Emphasis added.)
Mrs. Kahan left no written instructions in said health care proxy regarding the administration of artificial nutrition and hydration, and it is conceded that her wishes in that regard are not reasonably known and cannot with reasonable diligence be ascertained. There is surely no “clear and convincing” evidence on this specific issue. (See Matter of Westchester County Med. Ctr. [O’Connor], supra.)
Under these circumstances, the court finds that, pursuant to Public Health Law § 2982 (2) (b), respondent Joan Simonson, is without authority to make decisions about artificial nutrition and hydration for her mother, Lee Kahan.
*496 (e) Should the Health Care Proxy Held by Respondent, Joan Simonson, be Revoked?
Besides seeking emergency relief, the within petition also challenges the validity and viability of the subject health care proxy, in accordance with Public Health Law § 2992. Said section, in pertinent part, provides as follows:
“members of the principal’s family . . . may commence a special proceeding . . . with respect to any dispute arising under this article, including, but not limited to, a proceeding to:
“1. determine the validity of the health care proxy;
“2. have the agent removed on the ground that the agent ... (b) is acting in bad faith; or “3. override the agent’s decision about health care treatment on the grounds that: (a) the decision was made in bad faith or (b) the decision is not in accordance with the standards set forth in subdivision one or two of section two thousand nine hundred eighty-two of this article.”
As a first ground for revocation, the petition alleges that the subject health care proxy is void, since it was executed at a time when Lee Kahan lacked mental capacity, as required by Public Health Law § 2981 (1) (a). The court rejects this allegation. Pursuant to Public Health Law § 2981 (1) (b), every adult is presumed competent to appoint a health care agent. In light of the presumption of competency, the burden of proving mental incompetence is upon the petitioner (see Matter of Rose S., 293 AD2d 619 [2002]). The only testimony adduced at the hearing established that in June of 1998, Lee Kahan possessed all her mental faculties, and was indeed competent when she executed the subject health care proxy.
The more serious ground for revocation is in the nature of the agent, respondent Joan Simonson, allegedly acting in bad faith. According to the petitioner,
“by obstructing Lee Kahan’s receipt of optimal care via a PEG tube, and by forcing her to be maintained for many weeks on a nasogastric tube, respondent, Joan Simonson, has not only acted against Lee Kahan’s obvious best medical interests, she has also frustrated Lee Kahan’s deeply held values as an observant Jew, in violation of the requirements of Public Health Law Section 2982 (2) (a), which mandates that a health care agent make health care decisions *497 ‘in accordance with the principal’s wishes, including the principal’s religious and moral beliefs’.”
This contention, in essence, challenges the good-faith desire and readiness of the respondent, Joan Simonson, to make future health care decisions based on her mother’s religious and moral beliefs, which appear to differ from her own. In this regard, there is undisputed testimony that Lee Kahan is committed to traditional or religious Judaism, and in fact expressed a strong desire to be buried in the Orthodox manner. Honorable Roger Bohrer respected this wish of Mrs. Kahan, and commissioned the special coguardians to provide “for funeral arrangements to be conducted in accordance with Orthodox Jewish tradition.” Before determining whether respondent Joan Simonson acted in bad faith under the circumstances herein, the court will attempt to synopsize the Orthodox Jewish view on the treatment of the critically ill, as a reflection of her mother’s religious and moral beliefs.
(f) Jewish Law (Halacha) and the Care of the Critically 111
Judaism attributes infinite value to human life. “Infinity being indivisible, any fraction of life, however limited its expectancy or health, remains equally infinite in value.” (See Dr. Immanuel Jakobovits, Jewish Medical Ethics, at 276 [Bloch Publ. Co., NY 1975].) Accordingly, respectable authorities deem any active and deliberate hastening of death as sheer murder (see Rabbi E. Waldenberg, Sepher Ramat Rachel [Kuntres Bikkur Holim], end of Tzitz Eliezer, vol 5, at 38f: Rabbi Y.M. Tuczinsky, Sepher Gesher Hahayim, 1:44 [Jerusalem I960]; Rabbi J. David Bleich, Judaism and Healing, at 134-145 [Ktav Publ. Co., NY 1981]). Jewish law distinguishes between different stages of critical illness. A moribund patient (goses) has only three days or less to live. A patient with a terminal illness (chayay sha’ah) has been defined as one whose life expectancy is no greater then three months (as per Rabbi Yosef Shalom Elyashiv, see J. Kunin, Withholding Artificial Feeding from the Severely Demented: Merciful or Immoral? Contrasts between Secular and Jewish Perspectives, 29 J Med Ethics 208 [2003]), or according to other authorities one whose life expectancy is no greater than one year (see Responsa Aggrade Moshe, Chosen Mishpat II, vol 7, siman 75:1, at 315). From a Halachic perspective, a persistent vegetative state and Alzheimer’s disease, are not terminal conditions, per se, despite the fact that they are progressive, irreversible and inevitably result in death. Patients with these illnesses *498 deserve the same full range of treatment that is made available to any other patient (see Dr. Daniel Eisenberg, Halachic Issues Regarding Futility of Medical Treatment: Applications to Nutrition and Hydration in the Terminally III Patient, 39 Young Israel Viewpoint [No. 2] 65 [Winter 1996]). Judaism views nutrition and hydration by feeding tubes or intravenous lines not as medical treatment but as supportive care, no different from washing, turning, or grooming a dying patient (Dr. Fred Rosner, Rabbi Moshe Feinstein on the Treatment of the Terminally III, Modern Medicine and Jewish Ethics, at 233, 234 [Ktav Publ. House, Inc., Yeshiva Univ. Press, 1991]). The first Halachic principle of medical intervention is that whenever it is possible to increase the longevity of a patient, it should be done (see Rabbi Yaakov Kanevsky, Krinna D’Agrata 190:201 [1980]). On the other hand, Holyoke certainly takes pain and suffering into account. Under certain exceptional circumstances, only to be determined by a competent Rabbi, it has been held by Rabbi Moshe Feinstein that for a patient with pain and suffering who cannot be cured and cannot live much longer, it is not obligatory for physicians to administer medications briefly to prolong his life of pain and suffering, but nature may be allowed to take its course. (Responsa Aggrade Moshe, Chosen Mishpat II, supra, No. 73:1.) Rabbi Waldenberg has a different view, and rules that suffering serves to increase a person’s merit, and therefore prolonged suffering is a good reason to prolong life, in order to erase sins and to allow the person an opportunity to repent (Responsa Tzitz Eliezer, Sepher Ramat Rachel, supra, vol 5, at 28:5; see also Dr. Avraham Steinberg, The Terminally III Patient, The First International Colloquium, Medical Ethics and Jewish Law, at 315, 327-328 [1993]). Addressing the issue of intravenous feedings for terminally ill patients, Rabbi Feinstein says that
“for an incurably ill patient who had difficulty breathing, I have already stated that one must give him oxygen to relieve his suffering. It is also clear that such a patient who cannot eat manually must be fed intravenously, since such feeding strengthens the patient somewhat even if the patient does not feel anything [i.e. is comatose]. Food is not at all comparable to medication, since food is a natural substance which all living creatures require to maintain life.” (Responsa Aggrade Moshe, Chosen Mishpat II, supra, No. 74:3.)
Only great Halachic authorities can make the fine distinction between prolonging life and prolonging the act of dying (see Dr. *499 Fred Rosner, Jewish Perspectives on Death and Dying, 2 Jewish Medical Ethics [No. 1] 38, 40 [1991]; also see Dr. Avraham Stein-berg, Medical-Halachic Decisions of Rabbi Shlomo Zalman Auerbach, 3 Jewish Medical Ethics [No. 1] 30, 34 [1997]).
From this cursory overview, it is clear that the Halachic view can be intricate and complex. In practice, the final decision must involve detailed investigation and full consultation between the doctors, the family, and the rabbis, on a case by <2ase basis. The family should always consult someone suitable who understands both the medical and Halachic aspects. Such a person, after examining the situation in detail and clarifying it in his own mind, will be able to consult a rabbinical expert who will decide each case on its own merits (see Rabbi Zalman Nehemia Goldberg, “Terminally Ill-Halachic Questions,” The First International Colloquium, Medical Ethics and Jewish Law, at 338, 341 [1993]). Relying on one’s own research can lead to controversial conclusions (see e.g. Muriel R. Gillick, Artificial Nutrition and Hydration In the Patient with Advanced Dementia: Is Withholding Treatment Compatible with Traditional Judaism?, 27 J Med Ethics 12 [2001]).
Although it is too late for Lee Kahan, the best course for observant Jews wishing to prepare a health care proxy is to appoint a Halachic authority of their choice to rule on medical issues as they arise in the event they become incapacitated (see Rabbi Zev Schostak, Is There Patient Autonomy in Holyoke?, 2 Jewish Medical Ethics [No. 2] 22-27 [1995]). Within Orthodox Judaism, two versions of advanced directives have evolved. While the Rabbinical Council of America’s Health Care Proxy expounds a very specific position and advises its followers to make a living will following its mandates, Agudath Israel of America’s “Halachic Living Will” merely gives general guidelines as to what one should do and reserves ultimate decision-making to the individual’s preselected rabbi (see Rabbi A. Jeff Ifrah, The Living Will, 24 J Holyoke & Contemp Soc’y 121, 138 [1992]; also see Chaim Dovid Zweibel, The “Halachic Health Care Proxy”: An Insurance Policy with Unique Benefits, Jewish Observer, at 20-21 [Sept. 1990]).
Conclusion
The court is impressed with the zeal and devotion displayed by the petitioner Rose Borenstein for the care of her sister, Lee Kahan, as evident in this proceeding. However, there is no ques *500 tion that Lee Kahan, when competent, executed a health care proxy in accordance with article 29-C of the Public Health Law, designating her daughter, respondent Joan Simonson, as her health care agent. Even if said respondent had the authority to make the decision regarding the immediate insertion of a PEG tube for her mother, the court is not convinced that her reluctance to consent to such a procedure, which had been unanimously recommended by all her treating physicians, was in accordance with her mother’s wishes, especially her mother’s religious and moral beliefs. Of course, as has been exhaustively set forth above, it is now obvious that respondent Joan Simon-son never had the authority to make any decisions regarding the administration of artificial nutrition and hydration to her mother. Nevertheless, from the testimony adduced at the hearing, the court is persuaded that the respondent Joan Simonson did not act in bad faith and, in her own words, would not do “anything that would cause my mother to die.” Under the circumstances herein, the court finds that the revocation of the health care proxy held by respondent Joan Simonson is unwarranted.
Technically, the respondent Joan Simonson, who is the duly appointed health care agent, may render future decisions regarding medical treatment for her mother, other than artificial nutrition and hydration decisions, without consulting her aunt, the petitioner Rose Borenstein. Furthermore, the treating physicians are technically mandated to provide Lee Kahan with artificial nutrition and hydration, without ever consulting the respondent Joan Simonson. This, however, is not the ideal solution. In the end, this case is not about the aspirations of a sister or a daughter, it is about Lee Kahan’s wishes, including her religious and moral beliefs.
The truly ideal solution would be that families with differences regarding the appropriate medical care of an incompetent loved one, resolve their differences privately, on their own, with the aid of medical and clerical advice, and not have to resort to expensive and arduous legal proceedings.
The poignant lessons of the protracted Terri Schiavo case ring true here:
“It may be unfortunate that when families cannot agree, the best forum we can offer for this private, personal decision is a public courtroom and the best decision-maker we can provide is a judge with no prior knowledge of the ward, but the law currently *501 provides no better solution that adequately protects the interests of promoting the value of life.” (In re Guardianship of Schiavo, 851 So 2d 182, 186-187 [Fla Dist Ct App 2003].)
The moral imperative “to feed the hungry and give water to those who thirst” remains the same. Lee Kahan, though incompetent, suffering from end-stage dementia, is entitled, in her own words, to “life sustaining treatment.”
As has been said, “If we allow ourselves to become convinced, however subtly, through the use of mystifying and deceiving masks that some people are not fully human, we not only dehumanize them, we dehumanize ourselves.” (Adam J. Hildebrand, Masked Intentions: The Masquerade of Killing Thoughts Used to Justify Dehydrating and Starving People in a “Persistent Vegetative State” and People with Other Profound Neurological Impairments, 16 Issues L & Med 143, 165 [2000].) We must never forget that, “when the quality of life replaces the sanctity of life, society has done itself irreparable harm.” {See Dr. Fred Rosner, Jewish Perspectives on Death and Dying, supra at 45.)