OPINION OF THE COURT
Anthony J. Paris, J.
Petitioner, by order to show cause filed on July 11, 2002, seeks an order from this court pursuant to Public Health Law § 2992 determining the validity of a certain health care proxy executed by patient, Yvette Casimiro, on October 31, 1995, and a living will/power of attorney executed by said patient on April 3, 1997. Petitioner further seeks to remove respondents, Rosalie and Glenn Karschner, as the agents designated in said health care proxy and living will/power of attorney, or an order overriding their refusal to consent to the withholding or withdrawing of life sustaining treatment on the basis that they are acting contrary to the patient’s express intent as set forth in said instruments.
The court appointed Robert Jokl, Esq. to act as guardian ad litem for the patient and respondents Karschners, although appearing pro se at the initial stages of these proceedings, were ultimately represented by Martha E. Mulroy, Esq.
The matter came on for a hearing and the court had the unique opportunity during the course of these proceedings to weigh all of the evidence, to review all of the various exhibits received, as well as to assess and evaluate the demeanor and credibility of the array of witnesses that testified.
Petitioner has maintained throughout these proceedings that the health care proxy and living will/power of attorney are validly executed instruments and that the physical condition of the patient satisfies the specified criteria to invoke the patient’s expressed wishes that the life sustaining treatment currently in place be terminated. Petitioner further argues that, by their refusal and unwillingness to cooperate with the removal of these life sustaining systems, respondents are acting in contravention of the patient’s directions and intent, and, therefore, they should be removed as health care agents, or, in the alternative, their refusals should be overridden by this court.
*374 Respondents have argued that their aunt (through marriage and not by blood relation), whom they have known for 40 years, is a devout Catholic who resided with them for five years and did not intend to be removed from life sustaining treatment in the event that same became necessary to sustain her life. Respondents submit that Mrs. Casimiro did not fully understand the nature of the directions set forth in the health care proxy and living will/power of attorney documents that she executed in 1995 and 1997, respectively. Respondents have further maintained that the living will/power of attorney which was executed on April 3, 1997 was in fact later revoked by the patient.
Kay Ann Linderman testified that, on October 31, 1995, she witnessed Yvette Casimiro execute the health care proxy that is the subject of this proceeding. Ms. Linderman prepared this document in conjunction with her employment with James A. Travers, M.D., Mrs. Casimiro’s treating physician at that time. This congenial witness openly testified that although she did not specifically remember signing this particular health care proxy, the witnessing signature was undoubtedly hers. There was no direct testimony by this witness concerning whether or not Mrs. Casimiro understood the contents of the health care proxy.
Joseph Kelly, Esq. gave testimony indicating that in addition to preparing Mrs. Casimiro’s last will and testament, he also prepared the living will/power of attorney that Yvette Casimiro executed on April 3, 1997. According to this witness, Mrs. Ca-simiro knew and understood the contents of these documents, although the substantive language contained therein was his creation. Mr. Kelly also testified that, after the execution of the living will/power of attorney in 1997, he never heard from either the Karschners or Mrs. Casimiro about the revocation of this instrument.
Susan Orchard worked for attorney Kelly and testified that her signature appears on the living will/power of attorney. Mrs. Orchard further testified that she did not recall Yvette Casimiro or her specific execution of this instrument.
Dana Savici, M.D., testified that she was familiar with Mrs. Casimiro’s medical condition, having been one of her attending physicians since March 2002, when Mrs. Casimiro was first admitted to University Hospital. Dr. Savici testified that the patient has been diagnosed with advanced dementia/ Alzheimer’s, heart failure, respiratory failure and Parkinson’s disease. This witness further testified that Mrs. Casimiro was *375 receiving two life sustaining treatments, specifically, a tracheostomy which provides her with enriched oxygen, and a surgically inserted feeding tube which provides her with artificial nutrition and hydration. Moreover, from time to time, the patient has been on a ventilator due to respiratory distress and breathing difficulties.
It was Dr. Savici’s medical opinion that Yvette Casimiro was completely unaware of her environment, unable to communicate and interact with her environment, and cannot assist in her own care and feeding. She was of the further opinion that, although this patient is not immobile, she cannot respond to the spoken word and any noises she makes or hand gestures or head movements are merely reflex reactions. According to Dr. Savici, Mrs. Casimiro cannot return to a normal functioning life and is incompetent to make or formulate any health care decisions due to her condition.
Both respondents testified as to their relationship with Mrs. Casimiro. Yvette Casimiro is Rosalie Karschner’s great aunt by marriage. Rosalie Karschner has known Yvette Casimiro for 40 years and there is a close and loving relationship between respondents and Mrs. Casimiro. Yvette Casimiro relied heavily upon respondent, Glenn Karschner, especially during the period from 1995 to 2000 when she lived with the respondents. Due to the dementia and the Parkinson’s disease which affected Mrs. Casimiro, she left the respondents’ residence and became a resident at Iroquois Nursing Home in 2000. Thereafter, she was admitted to University Hospital in March 2002, at which facility respondents have been daily visitors.
In April of 1997, Yvette Casimiro visited the law office of Joseph Kelly, Esq. and executed a living will/power of attorney wherein she designated respondents as her attorneys-in-fact. Respondents both testified that shortly after the execution of this instrument, when they were reviewing it and other documents with her, Mrs. Casimiro confided to them that she did not realize the implications of this instrument. Mrs. Casimiro further stated that had she fully understood these implications — the disconnection of any life support equipment and the discontinuance of any medical treatment — that she probably would not have signed it.
Respondents also testified that, at Yvette Casimiro’s request, respondent Glenn Karschner made numerous attempts to contact attorney Kelly for the purpose of Mrs. Casimiro revoking and/or modifying the living will/power of attorney. However, they were not able to connect with Mr. Kelly for this intended purpose.
*376 The Karschners testified that no conversations were ever had with Mrs. Casimiro regarding the health care proxy she executed on October 31, 1995, and which designated Rosalie Karschner as her agent, because they were never aware of this instrument until it was presented to them at University Hospital in 2002.
Yvette Casimiro, according to respondents’ testimony, is a devout Roman Catholic and believes that only God can take a life. It was the respondents’ testimony that Mrs. Casimiro expressed this sentiment to them on many occasions. It was for this reason and Mrs. Casimiro’s expressed intent to revoke the living will/power of attorney that respondents refused to execute a do not resuscitate (DNR) authorization despite being asked to do so by the Ethics Committee of University Hospital.
Respondents were steadfast in their belief that Yvette Ca-simiro would desire to remain alive and would not want to be disconnected from any life sustaining measures notwithstanding any directions set forth in the health care proxy and living will/power of attorney to the contrary. Based on this earnest belief of their aunt’s true wishes, respondents have refused to execute a do not resuscitate authorization and this refusal has given rise to the initiation of these proceedings by University Hospital to remove respondents as agents or, in the alternative, to override their refusal to sign a DNR authorization.
Respondents further testified that, contrary to what Dr. Savici has indicated, their great aunt is not unaware of her surroundings, but rather, has smiled, followed them with her eyes and puckered up her lips when Rosalie Karschner has applied chap stick. Although they do not have medical backgrounds, respondents do not believe that such actions by Mrs. Casimiro are mere reflexes, but rather, that they are an expression of her awareness of their presence.
The issue before this court is the validity of the living will/ power of attorney and the health care proxy. Both instruments direct the patient’s agents, Rosalie Karschner in the health care proxy and both Karschners in the living will/power of attorney, to essentially authorize the termination of any life sustaining measures. Petitioner has presented evidence that both instruments were validly executed and urges that each remain in force. Respondents, on the other hand, urge the court to strike the living will/power of attorney as it was their great aunt’s intent to revoke same. They do not contest the validity of the health care proxy but maintain that by refusing to execute a DNR, they are, pursuant to this instrument, complying *377 with Yvette Casimiro’s wishes and desires to stay alive according to her devout Catholic beliefs that only God can take a life.
The positions of the respective parties are extremely polarized in this proceeding. Petitioner contends that Yvette Ca-simiro’s medical and mental condition is such that she cannot competently make life sustaining decisions and cannot survive without the life sustaining systems now in place. Petitioner argues, therefore, that the provisions of the valid and intact health care proxy executed by Mrs. Casimiro in 1995, and the living will/power of attorney executed in 1997, should be followed by her designated agents, the Karschners, or that they should be removed.
Respondents, on the other hand, maintain that their great aunt, through words and actions, meant to revoke the living will/power of attorney due to a lack of understanding of its implications and due to her strongly expressed religious beliefs concerning who can take a life. Respondents maintain that Mrs. Casimiro’s wishes are to remain alive and, therefore, they are acting in accordance with those wishes in not authorizing a DNR under the health care proxy.
Both parties in this matter rely heavily on the legal precedent set forth by the Court of Appeals in Matter of Westchester County Med. Ctr. (O’Connor) (72 NY2d 517 [1988]). The petitioner maintains that by executing a valid health care proxy and living will/power of attorney, Yvette Casimiro has indicated her legally protected desire, wish and intent to be removed from life sustaining treatment, and that desire and intent should be recognized and implemented by the court. Respondents Karschner urge that this was not their aunt’s intent once she fully realized the implications of the living will/ power of attorney, and that her specified wish was to remain alive, and that is what she and they should be allowed to do under the health care proxy (which document they knew nothing about until 2002).
The patient’s wishes must be established by clear and convincing evidence. (Matter of Westchester County Med. Ctr. [O’Connor], supra at 531.) In this proceeding, the burden of proof is borne by the petitioner, University Hospital, which seeks to terminate the life sustaining treatment currently sustaining the life of the patient, Yvette Casimiro. In determining whether or not that quantum of proof has been met, this court has necessarily considered a number and variety of factors including: the validity of the instruments which purportedly reflect the desire of the patient; the medical and physical *378 condition of the patient both at the time of execution and at present; any intervening factors that may have occurred between the period of execution and the present; the medical testimony and opinions offered as to the patient’s existing condition and prognosis concerning her capability of recovery; her expressions of desire and intent; and the patient’s expressed religious and moral beliefs.
The court has reviewed, considered and analyzed all of the evidence in the form of testimony and exhibits, as well as the written memoranda competently and thoroughly presented by the able and experienced attorneys for the parties. Based on this unique and exclusive opportunity, this court opines that University Hospital has not sustained the burden of proof necessary for this court to authorize the dis continuation of life sustaining treatment for the benefit of the patient Yvette Casimiro.
There is no question that the health care proxy and the living will/power of attorney were validly executed by Mrs. Ca-simiro in 1995 and 1997, respectively. Moreover, there is no question that Mrs. Casimir o’s current medical condition is extremely serious and that she cannot express or vocalize her present desire and intent, and may not be able to do so in the foreseeable future.
However, based on the evidence in the record, it appears that the patient’s words and actions indicate her desire to remain alive. Other than the execution of the health care proxy and living will/power of attorney, there was absolutely no evidence offered by petitioner that the patient vocalized or represented a desire to be removed from life sustaining measures or to have medical treatment discontinued if she was presented with such a circumstance. Moreover, there was no evidence that the patient had any previous family experiences with such a situation, or that she had expressed a strong, firm and persistent opinion that she should not be the beneficiary of such life sustaining measures.
On the contrary, respondents presented ample evidence to allow the court to formulate an opinion as to the patient’s commitment to the termination of life supports — there was no such commitment. While petitioner did demonstrate that two instruments were executed by Mrs. Casimiro, there was no unequivocal evidence presented that she understood the implications of the language set forth in these instruments which specifically provided for the termination of life supports. Further, the court finds that any reference to a certain health care survey signed *379 by the patient was inconsequential in determining her true desires. Moreover, there was unrefuted evidence of Mrs. Ca-simiro’s position once she realized the magnitude and permanence of the implications set forth in the living will/power of attorney that she executed in April of 1997.
A living will/power of attorney, unlike a health care proxy, is not a creature of statute. Therefore, without statutory guidelines, the court must necessarily examine the entire record to determine whether or not such an instrument, although validly executed some five years ago, may have been subsequently revoked by the words and/or actions of its signor.
In the present matter, based on the proof presented by respondents, there is little doubt that Yvette Casimiro, by her actions, revoked the living will/power of attorney executed on April 3, 1997. At the very least, the record reveals that Mrs. Casimiro intended to do so based on her statements to respondents as well as the tenets of her religious faith, particularly once Mrs. Casimiro understood the dire implications of the instrument she executed.
Therefore, by reason of the foregoing, the living will/power of attorney executed by Yvette Casimiro on April 3,1997 is hereby stricken in its entirety.
The health care proxy executed by Yvette Casimiro on October 31, 1995 was valid when executed and respondents do not question its authenticity. Unlike the living will/power of attorney, there was little testimony concerning conversations between Mrs. Casimiro and respondents other than the fact that they knew nothing about the health care proxy until it was presented to them at University Hospital. Their aunt had never indicated to them that she had executed such an instrument. In fact, there was no testimony that a duplicate original or copy of the health care proxy was in Mrs. Casimiro’s possession along with other personal papers with which respondents were familiar while Mrs. Casimiro resided with them from 1995 to 2000.
By comparison, these two instruments, executed separately in 1995 and 1997, are almost identical with the exception of the nutrition provision. By contrast, the health care proxy, unlike the living will/power of attorney, is a creature of statute and its existence is governed by article 29-C of the Public Health Law. While created by statutory provision — section 2981 of the Public Health Law — a health care proxy may also be revoked in accord with statutory provisions.
Section 2985 (a) of the Public Health Law reads, in pertinent part, as follows:
*380 “§ 2985. Revocation
“1. Means of revoking proxy, (a) A competent adult may revoke a health care proxy by notifying the agent or health care provider orally or in writing or by any other act evidencing a specific intent to revoke the proxy .” (Emphasis added.)
Insofar as the health care proxy predates the living will/power of attorney by almost two years, and as the instruments virtually contain the same provisions with the exception of nutrition, the court finds that the health care proxy executed by Yvette Casimiro on October 31, 1995 has been revoked by implication by virtue of her actions and statements revoking the living will/power of attorney which was subsequently executed by her.
By reason of the foregoing, the health care proxy executed by Yvette Casimiro on October 31, 1995 is hereby stricken in its entirety.
Petitioner’s petition is in all other respects denied.