OPINION OF THE COURT
Karen V. Murphy, J.
Petitioner F.H. moved by order to show cause for an order pursuant to Mental Hygiene Law § 81.02 (a) appointing the petitioner F.H. the health care special needs guardian and guardian ad litem for her brother S.S.; empowering F.H. to direct the immediate continuation of the connection and/or reconnection of the mechanical ventilator; and to further direct that the ventilator not be disconnected and that any other life-sustaining treatment or procedures be implemented. Petitioner further sought an order pursuant to Public Health Law § 2992 (1) and (3) voiding the appointment of R.S. under the January 2009 health care proxy executed by S.S. and other related relief.
Pending the hearing of the proceeding, respondents were “temporarily enjoined from interfering with or instructing any health care provider to withhold mechanical or other ventilation or breathing assistance, artificial nutrition and hydration from S.S.” and it was further ordered that pending the hearing, South Nassau Communities Hospital was not to remove the ventilator attached to S.S.
Mental Hygiene Legal Service was appointed counsel for S.S. A hearing was held at the hospital on Monday, March 23, 2009 and was continued there on Wednesday, March 25, 2009. At the start of the hearing, petitioner F.H. sought to amend the petition to name S.I. as an additional petitioner and that application was granted and the caption amended accordingly. At the conclusion of the hearing the court visited the patient, S.S., at his bedside.
In 1990, the Public Health Law was amended to add article 29-C — “Health Care Agents and Proxies.” The legislative intent was to establish a decision-making process to allow competent adults to appoint an agent to decide about health care treatment in the event they lose decision-making capacity. The legislation conferred no new rights regarding the provision or rejection of any specific health care treatment and affirmed existing laws and policies, which limit individual conduct, including those laws and policies against homicide, suicide, assisted suicide and mercy killing (L 1990, ch 752, § 1). Senator Michael J. Tully, Jr., stated in his memorandum in support of this bill (1990 NY Senate-Assembly Bill S6176-A, A7459-B) that the *569 bill was based upon the consensus of the diverse Task Force on Life and Law convened by Governor Mario Cuomo in March 1985. It was recognized that based upon the Court of Appeals decision in Matter of Westchester County Med. Ctr. (O’Connor) (72 NY2d 517 [1988]) the decision to decline the provision of life-sustaining treatment could be made only upon clear and convincing evidence that the patient, given the particular circumstances the patient was facing, would decline the particular treatment proposed. Recognizing that to be a “very stringent standard” that “may be difficult to meet in most cases” this law was enacted to fill what was believed to be a “critical gap” in the statutory framework governing health care decisions in New York. (Sponsor’s Mem, at 7, Bill Jacket, L 1990, ch 752, 1990 NY Legis Ann, at 362-363.)
Senator Tully explained that the O’Connor Court, despite stating a stringent standard (clear and convincing evidence), suggested that through the creation of a springing power of attorney, a principal could invest another person with authority to express the principal’s wishes with respect to medical treatment. Public Health Law article 29-C was enacted to “eliminate ambiguities in the law and obviate the need for a health care provider or family member to seek court approval of proposed treatment for an adult unable to make health care decisions.” (Sponsor’s Mem, at 7-8, Bill Jacket, L 1990, ch 752, 1990 NY Legis Ann, at 363.)
Governor Cuomo, in his approval memorandum, cited the bill as
“an effective means to ensure that [adult patients’] treatment wishes and interests will be protected if they lose the capacity to speak for themselves. . . .
“The person appointed as the ‘health care agent’ must make decisions based on the patient’s wishes, including consideration of the patient’s religious and moral beliefs.” (Governor’s Approval Mem, at 1, Bill Jacket, L 1990, ch 752, 1990 NY Legis Ann, at 364.)
The Governor discussed the standard of reasonableness adopted by the legislature. “If the patient’s wishes are not reasonably known, the agent must decide based on a judgment about the patient’s best interests.” (Id. [emphasis added].) Highlighting another safeguard, the Governor noted that a health care agent can decide against the provision of artificial nutrition and/or hydration only when the decision reflects the patient’s reason *570 ably known wishes. (Id.) The Governor further recognized, “The choices posed by medical advances will still be difficult. We will continue to confront them as patients, family members, or health care professionals. But the added anguish of legal uncertainty and confusion will be removed for patients who have created a health care proxy.” (Governor’s Approval Mem, at 2, Bill Jacket L, 1990, ch 752, 1990 NY Legis Ann, at 365.)
The stated intent to remove the legal uncertainty and confusion when a patient has created a health care proxy has apparently been met successfully in practice. In the nearly two decades since the health care proxy law was enacted there have been few reported decisions interpreting and applying Public Health Law article 29-C. While it appears to this court, based upon the memoranda supporting the bill’s passage, which contrasted the O’Connor decision and the reasonableness standard set forth in the statute, that the legislature rejected the clear and convincing standard when a health care proxy has been created, some courts are still applying the more stringent standard, thereby continuing the legacy of confusion and legal uncertainty. (See Matter of Casimiro [University Hosp. of State Univ. of N.Y. Upstate Med. Univ.], 194 Misc 2d 372 [Sup Ct, Onondaga County 2002]; Matter of Balich, 2003 NY Slip Op 51080[U] [Sup Ct, Suffolk County 2003]; Borenstein v Simonson, 8 Misc 3d 481 [Sup Ct, Queens County 2005].)
Regardless of our joie de vivre, death is still an inescapable certainty. Defining death, however, is becoming much more difficult and less certain. Historically, we had little to no control over how and when death would occur, but modern medicine has upset the laws of nature and created significant controversy regarding when life begins and ends. While recognizing the miracle of life-saving measures, the legislature and courts have been forced to consider the meaning of life and equally important, death, at times referencing a living corpse, to reflect the condition of a person incapable of living without the aid of machines and tubes. The statutory creation of a health care proxy assures that even those unable to speak may still exercise their right to refuse treatment that would sustain their existence, even after life as they knew it is forever over, or to exercise their right to have such treatment regardless of quality of life issues or futility of such treatment, because every life is precious and unique.
The matter sub judice pits a patient’s siblings against his wife. Not only are their differing positions based upon their re *571 lationship with the patient, religion and other beliefs, the very-intent of the principal is at issue. Herein the principal, while verbally expressing a wish to live his way and on his terms without being dependent upon machines, in response to being advised by his doctor that his future may well be dependent upon the use of a respirator, created a health care proxy stating “I wish to live.” This court is charged with trying to reconcile those seemingly incongruent and impossible desires to determine the principal’s wishes and whether the agent is acting in accordance with those wishes.
The principal and patient, S.S., was described by witnesses as a magnetic, loud, colorful, outspoken, “in your face kind of guy” who loved to work, loved the Yankees and loved life. He suffered from obesity, which impacted on his ability to breathe. Despite having his stomach banded several years ago, S.S. still loved to eat and continued to battle his weight and the adverse effects it had on his health. Approximately 21/2 years ago in November 2006, S.S. was rushed to the emergency room and during that hospitalization, due to elevated carbon dioxide levels, had to have a tracheotomy.
Dr. A., S.S.’s treating pulmonologist, who has treated S.S. since that hospitalization, testified. Dr. A. is both a friend and doctor to S.S. and he began treating S.S. for abdominal distress and breathing difficulties after seeing him in the emergency room in November 2006. S.S. had an extended stay in the intensive care unit (ICU) at that time. S.S. was able to be weaned off the respirator and was sent for rehabilitation upon his release from the hospital. After a brief rehospitalization, S.S. returned home and while frustrated by limitations pertaining to the tracheotomy, for example his inability to swim, he resumed working and went about his activities of daily living.
After S.S. fell ill on January 5, 2009, R.S. took him to see Dr. A. Petitioner F.H. followed them to the doctor’s office in her own car and waited in the waiting room while R.S. and S.S. met with Dr. A. At that visit, Dr. A. discussed S.S.’s condition and treatment alternatives going forward, including antibiotics, a stomach scope and a respirator. S.S. said he did not want a mechanical ventilator or artificial nutrition. According to Dr. A. and R.S., S.S. often complained about the tracheotomy and repeatedly tried to have it removed because “[t]his is no way to live.”
S.S. spoke about the people he saw while he was in ICU and “rehab,” dependent on tubes to live and was very animated and *572 emphatic that he was willing to die rather than live like that. This was so, despite having already benefitted from the type of devices he was now rejecting, i.e., the NG (nasogastric feeding) tube and respirator during the November 2006 hospitalization.
In light of that, Dr. A. brought up the subject of a health care proxy and provided the form, which meets the statutory criteria, to S.S. and encouraged him to fill it out. R.S. actually completed the form for S.S.’s signature. At S.S.’s direction, R.S., in paragraph “2. Optional Instructions” wrote: “I wish to live.” Dr. A. acknowledged never having seen anyone write such a statement on a health care proxy, but explained that S.S. did not want the doctor to give up on him, he wanted the tracheotomy out “in the worst way,” so that he could go to the beach club, and wanted to live on his terms, not in a nursing home. The doctor said that S.S. spoke to him on a number of occasions about the value S.S. placed on the quality of life. S.S. was very emphatic, very clear about how he wanted to live, and spoke often on the subject, including his desire to go to Yankees games and the beach club.
Although Dr. A. did not recall F.H. being in the waiting room on that visit, he acknowledged speaking to her about S.S. on other occasions. S.S. did not list an alternate health care agent.
5.5. ’s siblings, the petitioners herein, while interested in S.S.’s care, were not chosen by S.S. to be his health care agents, nor did he advise Dr. A. that he would like to discuss his care and treatment or the health care proxy with them prior to signing it.
Petitioners are Orthodox Jews and while S.S. was brought up in an Orthodox household, he has not been observant for decades. S.S. clearly respected his family’s observances but he did not belong to a temple, he worked on the Sabbath, including during the year of mourning following his father’s death, and did not keep a kosher home or attend religious services on a regular basis. The strongly held views of petitioners were not 5.5. ’s. It was important to S.S., however, that when his time came, he wished to be buried with his mother, and wanted his brother, petitioner S.I., to officiate, and further that his funeral arrangements would be made by S.I. S.S., while freely discussing his funeral arrangements with his brother, reportedly did not speak to him about artificial nutrition, hydration, the ventilator or other treatment or end-of-life decisions.
F.H., upon learning at Dr. A.’s office that the doctor told S.S. that he must lose weight or he would be on a respirator and *573 that S.S. had signed a health care proxy stating that he “wished to live” never discussed with S.S. what he meant by that, or what S.S.’s wishes were, nor did she inquire as to why she was not an alternate agent. Indeed, she acknowledged that S.S. was not an Orthodox Jew, and while her position, based upon her religious beliefs, is to prolong life no matter what the circumstance, the evidence did not establish that S.S. shared her religious views. F.H. also denied ever having a specific conversation with S.S. regarding the use of a ventilator or artificial nutrition and hydration, but stated that they talked about his funeral arrangements.
Petitioners allege that respondent R.S. is acting contrary to S.S.’s religious beliefs; not in his best interests in that she has not agreed to the insertion of a PEG (percutaneous endoscopic gastrostomy) tube, for optimum care to replace the NG tube; and further that she is acting in bad faith in that she is motivated by fear of the financial ramifications of S.S.’s health care. No evidence was presented to establish that S.S.’s insurance would not be continued or that financial circumstances were dire or that R.S.’s decisions are being made for financial reasons. While the petitioners testified that S.S. honored his father’s wishes and joined in his siblings’ decision not to withhold life-sustaining treatment from his dying father four years ago, there was no evidence that S.S. sought the same treatment for himself. Whether S.S. may have chosen to speak only of an Orthodox funeral but not end-of-life decisions because he knew his wishes were contrary to his siblings’ religious beliefs is a matter of speculation and cannot be determined by this court. The evidence established that while S.S. chose not to live as an Orthodox Jew, it was his desire to be buried in accordance with Orthodox tradition.
Petitioners argue that S.S.’s request that Hatzalah be called was either a dying declaration or an excited utterance indicative of his desire to be saved and consistent with his instructions in the proxy, “I wish to live!!!” Hatzalah is a community ambulance service that strictly adheres to Orthodox Jewish law and one that S.S. had used previously. The court notes that had 911 been called instead of Hatzalah, the emergency medical technicians would have also worked to save S.S., as saving lives is a shared mission and responsibility of all first responders. The court does not find the choice of ambulance service to be either a dying declaration or excited utterance; nor does “Call Hatzalah” establish anything other than S.S.’s acknowledgment that *574 he was in need of immediate medical care. The agent’s unfortunate use of punctuation (!!!) after writing S.S.’s “I wish to live!!!” statement was not at S.S.’s direction and the court credits R.S.’s explanation of her “habit” of adding exclamation points and does not share petitioners’ contention that the punctuation was significant or meaningful to S.S. The court notes that at the time R.S. unilaterally added the exclamation points, S.S. was walking, talking and while not in robust health, was on his way home from an office visit and not in extremis.
The petitioners did not produce any witnesses who claimed to have discussed S.S.’s wishes regarding health care. The only evidence presented at the hearing regarding S.S.’s expressed wishes with respect to his health care and treatment was adduced through the testimony of Dr. A. and R.S. Both individuals had numerous conversations with S.S., wherein he indicated his desire to live life to the fullest, but that he did not want to be on a respirator. Indeed, he did not even want the tracheotomy, a less burdensome form of treatment. R.S. testified that she and 5.5. discussed the Terri Schiavo case when it was being reported in the news and how he did not want to live like that. She also recalled that while S.S. was in rehab, each day she wheeled him by the room next to his, he would look at the young girl, laying all but lifeless in her bed, hooked up to machines and tubes and would say that he would not want to live like that.
The testimony supports a finding that S.S. wanted to live life to the fullest, not to merely exist, unable to communicate and interact with his family and friends. The evidence established 5.5. expressly entrusted his wife to be his health care agent and to carry out his wishes, as expressed again to R.S. and to Dr. A. just days before suffering a heart attack and severe neurological damage to his brain.
I find that the health care proxy executed by S.S. on January 5, 2009 is valid and meets the statutory criteria set forth in Public Health Law § 2981. While this proceeding was properly commenced by the principal’s siblings pursuant to Public Health Law § 2992, the petitioners have failed to establish any ground upon which the agent should be removed; they have not established that the agent is acting in bad faith; nor have they proffered any proof that would warrant overriding the agent’s decision on the grounds that the decision was made in bad faith or that it was not in accordance with Public Health Law § 2982 (1) or (2). Mere speculation or hope, regardless of how heartfelt, cannot override the agent’s decisions, which have priority over other surrogates (Public Health Law § 2982 [4]).
*575 Having determined that the health care proxy is valid, there is no need for a guardian of the person or property of S.S. pursuant to Mental Hygiene Law § 81.02. Petitioners failed to establish grounds for such an appointment. (See Matter of Isadora R., 5 AD3d 494 [2d Dept 2004]; Matter of Albert S., 286 AD2d 684 [2d Dept 2001].)
Accordingly, the petition is dismissed.