OPINION OF THE COURT
William P. Polito, J.
Background
On or about May 18, 2010 the petitioner, Carole Zornow, applied to the court to be appointed guardian for her mother, Joan M. Zornow, under the Mental Hygiene Law, primarily to make end of life decisions. Her mother is 93 years old, suffering from advanced Alzheimer’s, and residing in a nursing home. There was a dispute between her and the other six siblings, mainly involving previously enacted MOLSTs (medical orders on life-sustaining treatments). The primary dispute was a blanket directive denying her mother food and water if it could not be administered orally (hereafter referred to as artificial feeding). Also, it was further directed that she be denied hospitalization for future medical conditions. On the return date of July 13, 2010, after review of the submissions, and discussion with counsel, the court approved by agreement the petitioner and her brother Douglas Zornow as temporary coguardians, and advised that should the need arise in the interim in which an imminent decision needed to be made for their mother, upon which they could not agree, immediate application could be made to the court for resolution. The court in the best interests of the patient also temporarily revoked all of the MOLSTs, except the DNR, as it could not identify any statutory authority or immediate basis for such directives. (Order dated Aug. 25, 2010; Matter of Nimon, 15 AD3d 978 [4th Dept 2005].) The court also issued a separate letter order dated August 25, 2010 identifying the issues to be resolved, and requested prior submissions to determine the existence of any factual disputes returnable September 21, 2010. The attorney for Douglas Zornow failed to submit any statutory authority for the prior MOLSTs, and, although acknowledging no health care proxy or written direc *452 tives were enacted by his mother, contended that his mother verbally indicated to him and the other siblings that artificial feeding be denied her if she were unable to take food and water orally. The petitioner denied such directions were given, stated that her mother had indicated the contrary by affirmatively requesting artificial feeding, and further, while lucid, her mother had also repeated such direction to her nurse, who recorded it in the nursing home health care records. The court then by letter dated November 3, 2010 scheduled a hearing date for November 23, 2010 and identified specific issues to be addressed. The court invited additional evidentiary submissions prior to the hearing date to which the parties complied. The petitioner’s siblings then elected not to participate in the hearing or to attend the same, although they did agree to the sole appointment of Catholic Family Center, and would abide in that organization’s future decision, but relied on their papers submitted regarding the current dispute on artificial feeding. They opposed the appointment of their sister. At the hearing, the court determined that even if the other siblings had testified as indicated in their affidavit regarding their mother’s wishes it was too vague, too general, not related to, and prior to any specific condition, and, therefore, did not comply with the “clear and convincing” standards required by the Court of Appeals in Matter of Westchester County Med. Ctr. (O’Connor) (72 NY2d 517 [1988]). In addition, the court found that based on the affidavit of the petitioner and the undisputed documented hospital or nursing home records of the mother, that her request under those specific conditions did show by clear and convincing evidence that she wished to receive artificial feeding. Accordingly, the prior directives and MOLSTs, except for the DNR, were permanently revoked. The court made the necessary findings under the Mental Hygiene Law regarding the need for appointment of a guardian for the incompetent person, and appointed the petitioner and Catholic Family Center as coguardians. The court appointed the petitioner as she was the person with whom her mother resided for the past several years during her early illness, had cared for her, had been extremely solicitous of her mother’s care and best interests, and had been gifted the house by her mother 16 years earlier. Since the brother and other siblings refused appointment, but did agree to an appointment of Catholic Family Center, that co-appointment was made to allow all the siblings to have an opportunity for a say in the future decisions, and to protect their right to see their mother out of the presence of the petitioner. Also, any idiosyncrasies of the sister as alleged could be balanced by Catholic Family Center, which would still give the *453 mother the benefit of all her children at the nursing home, and the petitioner’s more solicitous efforts. Further, the court determined that the applicable principles to be applied to Mrs. Zornow’s end of life decision were those of her Roman Catholic religious belief. The court advised that it would review those principles to determine their application especially to the particular area of dispute, viz., under what condition should artificial feeding continue and when should it terminate, and would submit a written decision thereon, as well as the parameters of the coguardian’s authority. No objection was made to the process. (See Borenstein v Simonson, 8 Misc 3d 481 [Sup Ct, Queens County, Martin E. Ritholtz, J., 2005] [where the fact-finding court used the same process on the identical issue under the Mental Hygiene Law and a health cary proxy on behalf of an Orthodox Jewish person, and arrived at a similar resolution]; Mental Hygiene Law § 81.12 [b]; State Administrative Procedure Act § 306 [1].)
Decision
Mrs. Joan Zornow, a Roman Catholic, is obligated by her religious beliefs to continue to receive artificially administered food and water under each of the three statutory conditions, absent the particular and specific restrictive medical conditions hereafter stated. Therefore, any purported authorization and enactment of a general MOLST, or any directive for Mrs. Zornow by her guardians as surrogate decision makers, which would deprive her of artificially administered food and water, when the medical conditions allowed for such withdrawal by the patient’s Catholic religion and moral beliefs are not in existence, particularly, an imminent death, and an inability of the food and water “to accomplish its proper finality, which is the hydration and nourishment of the patient” (Attachment 1, United States Conference of Catholic Bishops, Commentary on Nutrition and Hydration), would be a violation of the statutory law, and invalid.
Further, blanket directives are not readily amenable to Catholic end of life determinations as they are for intentional terminations of life based on a “quality of life” ethic, which is morally prohibited to Catholics. Therefore, MOLSTs and blanket directives should not be used on behalf of Mrs. Zornow, as was improperly done here, unless particularized to the specific principles applicable to the specific medical conditions actually encountered or to be encountered. The latter method of specificity without a MOLST (except for DNR) will also allow consulta *454 tion opportunity with the family, and their input, before choosing to receive or forgo further care or treatment, where allowable, when the actual medical condition occurs.
The coguardians in making decisions shall consult with each other and the siblings. If the decision is one which requires a determination of forgoing end of life care or treatment, they shall also consult with and obtain the advice of a priest or someone well trained in Catholic moral theology, as is recommended for Catholics in A Catholic Guide to End-of-Life Decisions by the National Catholic Bioethics Center.
Issue Raised
The main dispute between the siblings is whether their mother should be deprived of food and water which requires artificial administration. The statute provides that where the patient can take or be administered food and water orally it is considered ordinary care, and is explicitly excluded from the statute’s application (Public Health Law § 2994-d [5] [d]). That statute further provides that where, as here, an incompetent person, prior to incompetency, has not appointed a health care proxy, and has not consented to denial or withdrawal of artificially administered food and water, it may be still withdrawn if one of three conditions or standards exist, even though not requested. (Public Health Law § 2994-d [5] [a].) Further, even if any of the three conditions exist, the statute also requires and directs that the religious and moral beliefs of the patient be determined and, if inconsistent therewith, take precedence, and must be followed. (Public Health Law § 2994-d [4] [a] [i], [ii]; [b].) Although none of the three conditions presently exist, the likelihood that one of the three conditions may occur, coupled with the siblings’ continued dispute, and a law which allows the present issuance of blanket medical directives to cover future medical conditions, when and if they should occur, requires the court to presently identify the incapacitated person’s religious belief for end of life care applicable to her present and future medical conditions where presently disputed, and to provide guidelines or parameters of authority for the coguardians for determining other end of life decisions, which may occur in the future.
Applicable Law
The court and the coguardians appointed under the Mental Hygiene Law are obligated to decide the dispute in accordance *455 with the standards of the statute, which became effective June 1, 2010. (Matter of M.B., 6 NY3d 437 [2006].)
FHCDA Shift in Ethic and Burden
The Family Health Care Decisions Act (FHCDA) (Public Health Law art 29-CC) reflects a major departure in who and under what standard life sustaining treatment may be terminated for a mentally incompetent person. The FHCDA reflects a major change from the prior “presumption” of life. (Matter of Edna M.F., 210 Wis 2d 557, 571, 563 NW2d 485, 491 [1997], cert denied sub nom. Spahn v Wittman, 522 US 951 [1997].) Previously, absent indication from the principal to the contrary, a “presumption of life” applied. Here, absent such indication, a “presumption of termination” applies, especially by deprivation of artificially administered food and water. (See Borenstein, 8 Misc 3d at 493.) Ironically, now when a principal selects a person whom he or she trusts in a health care proxy to make decisions on his or her behalf, the law of that proxy is that, absent an indication to the contrary, that person must provide food and water (Borenstein at 494-495, citing Public Health Law § 2982 [2]), while someone designated by statute, in whom the patient may have no trust whatsoever, can terminate his or her life earlier than his or her natural death by such deprivation of food and water, despite the principal never having indicated a desire for such earlier termination. Under the statute, the “quality of life ethic” has become the automatic main ethic while the “sanctity of life ethic” is given the affirmative burden to “opt out.” Further, the grant of immunity to those implementing the decision for ordinary tort liability and accountability reinforces that shift in ethic.
Application of Roman Catholic Religious Beliefs
Accordingly, the court will set forth the basis of its findings and analysis in resolving the disputed care, i.e., deprivation of artificial feeding, including its difficulties in finding the authoritative Catholic position. Additionally, the court will define its limits, which are also the same limitations applicable to the co-guardians regarding their determination of other end of life issues which may arise.
A Catholic
Relevant to the proper application of the statute are the patient’s religious beliefs. Mrs. Joan Zornow is a practicing *456 Catholic. Her attorney advises that prior to her illness she was a daily communicant at mass. Her attorney also asserts that food and water directives and other treatment be made in accordance with her Catholic religious beliefs.
Advanced Alzheimer’s
Also relevant is Mrs. Zornow’s medical condition. She is 93 years old. She has advanced Alzheimer’s, which is a continuing brain degeneration disorder. While the condition can result in death when the brain damage becomes so advanced that it affects the brain’s ability to control breathing, such Alzheimer’s death is rare. The reason is that before that level of brain degeneration occurs, the patient as a result of the progression of the condition experiences difficulties of an inability to swallow, incontinence, and/or secondary infections of the lungs, or bladder, which then cause death by pneumonia, or other deadly infection. (Emily Yoffe, How Does Alzheimer’s Kill, Slate, Apr. 30, 2001 [with assistance of Dr. Peter J. Whitehouse of Case Western Reserve University School of Medicine, Dr. Harry Rosenberg of the National Center for Health Statistics, and Danny Chun of the Alzheimer’s Association]; Alzheimer’s Association, 2010 Alzheimer’s Disease Facts and Figures, at 18 [Mortality — Deaths from Alzheimer’s Disease].)
Law and Rationale
First Condition of the Statute
If the providing of food and water is considered an extraordinary burden (in the opinion of the surrogate) for a permanently unconscious patient, even where death is not occurring, the statute allows the deprivation of food and water by artificial means. This condition is often referred to as a coma. In such case, if the cause of death is starvation or dehydration and not the patient’s underlying condition it constitutes euthanasia (Black’s Law Dictionary 575 [7th ed 1999]).
Catholic Position
The Catholic Church does not define or consider artificial administration of food and water as extraordinary or even medical “treatment,” but is always defined as ordinary care. Further, it does not allow the termination of food and water despite a vegetative state or an advanced Alzheimer’s condition where the patient is not dying, or if dying, the death is not so im *457 minent, such that the cause of death becomes the starvation or dehydration, rather than the imminent underlying condition.
Application
The patient is currently not suffering from this medical condition as she is not unconscious. However, if she were to become permanently unconscious, and not in the actual process of dying from the underlying condition, the administration of food and water, which her religion believes is always to be considered comfort or basic care, even if administered artificially, is obligatory.
Second Condition of the Statute
If the providing of food and water is considered an extraordinary burden (in the opinion of the surrogate) for a patient with a life expectancy of less than six months (as opined by two doctors) and unable to take food and water orally, the patient may be deprived of food and water.
Catholic Position
The Catholic Church, in addition to considering artificial administration of food and water as never extraordinary or even medical “treatment,” as aforesaid, also does not allow the termination based upon a six-month “quality of life,” where, again, the cause of death is by starvation or dehydration, rather than the imminent underlying condition.
Application
The second condition is also not applicable because the patient here is not dying, nor is her life expectancy less than six months. Even if the six-month diagnosis is given, food and water may not be withheld until death is “imminent,” and the limited exceptions occur.
Third Condition of the Statute
If the providing of food and water would cause inhumane pain, suffering, or other burden, under circumstances in which it would be considered extraordinarily burdensome to a patient who (in the opinion of the surrogate) has an irreversible condition, the patient may be deprived of food and water.
Catholic Position
The existence of an irreversible condition is not in itself a valid or particularly helpful criterion for the Catholic Church, *458 unless death is imminent coupled with a futility to administer food and water either due to emerging complications of the inability of the person’s system to assimilate the food and water, or “in some rare cases [where] artificial nourishment and hydration may be excessively burdensome for the patient or may cause significant discomfort, for example resulting from complications in the use of the means employed.” (See attachment 1, Commentary on Nutrition and Hydration, approved by the Cardinal and Bishop members of the Congregation for the Doctrine of the Faith released on September 15, 2007.) However, here, since pain can be medically regulated, and the patient’s body can assimilate the food and water, despite the existence of an irreversible condition from which the patient is not imminently dying, ordinary comfort care, including artificially administered food and water, is obligatory if she were to become unable to swallow due to the often occurring symptoms of Alzheimer’s. The significant distinctions from the statute’s allowances are the lack of the imminence of death from the underlying condition coupled with the lack of one of the aforesaid extremely rare situations, for which the Catholic Church allows the removal of the comfort care of food and water.
Application
While the patient here is suffering an irreversible condition, she is able to take food orally and, therefore the statute is not applicable to her present condition. However, if the administration of food and water cannot be administered orally due to an often expected progression of Alzheimer’s in causing swallowing difficulties, the artificial administration of food and water would not in a medical sense ordinarily cause inhumane pain, be unable to be assimilated, or be extraordinarily burdensome to administer, and in the absence of the onset of imminent death, the providing of food and water is always considered ordinary care and obligatory for Catholics.
The Catholic Position on Forgoing Food and Water
On August 1, 2007, the Catholic Church resolved for its members, including its Bishops and clergy, the moral debate among its theologians, including dissident theologians, and various organizations as to whether the natural or artificial administration of food and water to a person in a persistent vegetative state was extraordinary or disproportionate treatment and not morally obligatory, or whether it was an ordinary *459 or proportionate means of preserving life and morally required (see William E. May [Professor of Moral Theology, The Catholic University of America], Caring for Persons in the “Persistent Vegetative State” and John Paul II’s March 20 2004 Address “On Life-Sustaining Treatments and the Vegetative State”, chapter 3 in Artificial Nutrition and Hydration [Christopher Tollefsen ed], volume 5 of Catholic Studies in Bioethics in the series Philosophy and Medicine [Dordrecht/Boston/London: Kluwer Academic Publishers 2008]).
The Catholic Church through the Universal Magisterium clearly resolved the issue in favor of the latter. The decision was in accordance with and mirrored Pope John Paul IPs moral theology as advanced prior thereto in his March 20, 2004 Address in the exercise of his ordinary authority to a world congress of the most advanced medical, scientific, and theological persons in light of the most current medicine and science addressed to this area of expertise (Address of Pope John Paul II to the Participants in the International Congress on “Life-Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dilemmas”). The Church’s Magisterium resolved the issue as follows:
“CONGREGATION FOR THE DOCTRINE OF THE FAITH
“RESPONSES TO CERTAIN QUESTIONS OF THE UNITED STATES CONFERENCE OF CATHOLIC BISHOPS CONCERNING ARTIFICIAL NUTRITION AND HYDRATION
“First question: Is the administration of food and water (whether by natural or artificial means) to a patient in a vegetative state morally obligatory except when they cannot be assimilated by the patient’s body or cannot be administered to the patient without causing significant physical discomfort?
“Response: Yes. The administration of food and water even by artificial means is, in principle, an ordinary and proportionate means of preserving life. It is therefore obligatory to the extent to which, and for as long as, it is shown to accomplish its proper finality, which is the hydration and nourishment of the patient. In this way suffering and death by starvation and dehydration are prevented.

“Second question: When nutrition and hydration are being supplied by artificial means to a patient in a ‘permanent vegetative state’, may they be discontin
*460
ued when competent physicians judge with moral certainty that the patient will never recover consciousness?

“Response: No. A patient in a ‘permanent vegetative state’ is a person with fundamental human dignity and must, therefore, receive ordinary and proportionate care which includes, in principle, the administration of water and food even by artificial means.

“The Supreme Pontiff Benedict XVI, at the Audience granted to the undersigned Cardinal Prefect of the Congregation for the Doctrine of the Faith, approved these Responses, adopted in the Ordinary Session of the Congregation, and ordered their publication.

“Rome, from the Offices of the Congregation for the Doctrine of the Faith, August 1, 2007.
“William Cardinal Levada

“Prefect

“Angelo Amata, S.D.B.

“Titular Archbishop ofSila

“Secretary.”
Artificially Administered Food and Water Must Ordinarily Always be Given
Artificially administered food and water is always a natural means of preserving life and not a medical act. For Catholics in a persistent vegetative state or a coma it is obligatory in almost all situations. The Congregation’s declaration for the most extreme condition of persistent vegetative state or coma for patients whose condition itself does not place them in imminent danger of death, and with food and water will live for many years, is applicable to others in similar nonterminal conditions, including advanced Alzheimer’s. A commentary was also issued at the same time as the declaration on nutrition and hydration approved by the Cardinal and Bishop members of the Congregation clarifying the directive:
“Patients in a ‘vegetative state’ breathe spontaneously, digest food naturally, carry on other metabolic functions, and are in a stable situation. But they are not able to feed themselves. If they are not provided artificially with food and liquids, they will die, and the cause of their death will be neither an illness nor the ‘vegetative state’ itself, but solely starvation *461 and dehydration . . .
“What may become a notable burden is when the ‘vegetative state’ of a family member is prolonged over time. It is a burden like that of caring for a quadriplegic, someone with serious mental illness, with advanced Alzheimer’s disease, and so on . . .
“ ‘It [artificially administered food and water] is therefore obligatory, to the extent to which, and for as long as, it is shown to accomplish its proper finality, which is the hydration and nourishment of the patient’. It is made clear, secondly, that this ordinary means of sustaining life is to be provided also to those in a ‘permanent vegetative state’, since these are persons with their fundamental human dignity.” (Attachment 1, United States Conference of Catholic Bishops, Commentary on Nutrition and Hydration, quoting Congregation for the Doctrine of the Faith Responses, supra [emphasis added].)
“[T]he artificial administration of water and food generally does not impose a heavy burden either on the patient or on his or her relatives. It does not involve excessive expense; it is within the capacity of an average health-care system, does not of itself require hospitalization, and is proportionate to accomplishing its purpose, which is to keep the patient from dying of starvation and dehydration. It is not, nor is it meant to be, a treatment that cures the patient, but is rather ordinary care aimed at the preservation of life. (Id.)
“(I)n the ordinary circumstances of life in our society today, it is not morally right, nor ought it to be legally permissible, to withhold or withdraw nutrition and hydration provided by artificial means to the permanently unconscious or other categories of seriously debilitated but nonterminal persons. Rather, food and fluids are universally needed for the preservation of life, and can generally be provided without the burdens and expense of more aggressive means of supporting life.” (William E. May and Msgr. William Smith et al., Feeding and Hydrating the Permanently Unconscious and Other Vulnerable Persons, 3 Issues L & Med 203, 211 [winter 1987]; also see Caring for Persons in the “Persistent Vegetative State” and Pope John Paul II’s March 2004 Address, at 69 [the declara *462 tion applies to others in similar condition, “e.g. those suffering from advanced dementia, severe stroke, advanced metastases, quadruple amputees, etc.”].)
Exceptional Cases Allowing Catholics to Forgo Food and Water
“When stating that the administration of food and water is morally obligatory in principle, the Congregation for the Doctrine of the Faith does not exclude the possibility that, in very remote places or in situations of extreme poverty, the artificial provision of food and water may be physically impossible, and then ad impossibilia nemo tenetur. However, the obligation to offer the minimal treatments that are available remains in place, as well as that of obtaining, if possible, the means necessary for an adequate support of life. Nor is the possibility excluded that, due to emerging complications, a patient may be unable to assimilate food and liquids, so that their provision becomes altogether useless. Finally, the possibility is not absolutely excluded that, in some rare cases, artificial nourishment and hydration may be excessively burdensome for the patient or may cause significant physical discomfort, for example resulting from complications in the use of the means employed.
“These exceptional cases, however, take nothing away from the general ethical criterion, according to which the provision of water and food, even by artificial means, always represents a natural means for preserving life, and are not a therapeutic treatment. Its use should therefore be considered ordinary and proportionate, even when the ‘vegetative state’ is prolonged. (Commentary on Nutrition and Hydration, Attachment 1.)
“His [Pope John Paul II’s] teaching in no way requires that tubally assisted feeding or hydration be maintained at all costs, but only when the benefits such assistance provides are present and no excessive burdens are imposed. If in particular instances such feeding/hydration would not effectively preserve life or alleviate suffering it would lack its beneficial effect and would be futile.” (William E. May, Caring for Persons in the “Persistent Vegetative State” and John Paul II’s March 20 2004 Address *463 “On Life-Sustaining Treatments and the Vegetative State”.)
When the food and water administered cannot accomplish its purpose of providing nourishment to the body, and cannot be assimilated by the patient’s body due to the underlying condition, it may morally be withdrawn or denied.
Also when the artificial administration of food and water is not alleviating suffering, that is, the providing of such care itself is causing such suffering so as to constitute an excessive burden, it may be forgone. However, “the insertion of a feeding tube, particularly through enteral and not perienteral means, is neither futile nor burdensome in almost all cases.” (Id.) Further, “adequate interventions exist to control pain in 90 to 99% of patients.” (See Burke J. Balch, J.D. and David Waters, Why We Shouldn’t Legalize Assisting Suicide, Part II: Pain Control [with cited medical authorities].)
The cost of tubally assisted feeding is not a basis for denying food and water administered by artificial means in the United States. (See attachment 2, Q & A from the USCCB Committee on Doctrine and Committee on Pro-Life Activities regarding The Holy See’s Responses on Nutrition and Hydration for Patients in a “Vegetative State”.)
“At present, the cost for taking care of PVS patients is usually covered in great part by insurance or other programs. But one cannot legitimately avoid excessive expense (if this does become an issue) by abandoning care for the person and by intentionally bringing his death about by starvation. There are morally legitimate ways to reduce the cost of care. Persons put into the situation of caring for a loved one in the PVS state or other conditions are not obliged to have them cared for in highly expensive hospitals or nursing homes (if insurance and governmental help are inadequate). They can remove them from these costly institutions, take them home and do the best they can with the help of such services as hospice care, volunteers from the parish or neighborhood, etc. The high standards of care possible in expensive institutions might not be possible, but one can still maintain solidarity with the person doing what one can, including providing food and nourishment by tubal means (not too difficult to do once begun, even at home). One does not have to endure undue financial burden” (William E. May, *464 Caring for Persons in the “Persistent Vegetative State” and John Paul II’s March 20 2004 Address “On Life-Sustaining Treatments and the Vegetative State”).
“But simply providing the permanently unconscious with food and water does not impose burdens on families or other care-givers, just as the feeding of those paralyzed from the neck down or suffering loss of all limbs does not impose excessive burdens on care-givers. The burden they carry is not caused by the feeding but rather by the seriously debilitating condition of those for whom they care. But this is a burden that must in justice be accepted by others. Would those opposing John Paul II claim that we should stop feeding the demented, the paralyzed, quadruple amputees, and individuals who are simply ‘not with it’? Withholding or withdrawing tubally provided food and water would not eliminate the burden of care-givers; only the death of those cared for would end the burden.” {Id. at 19-20; see also March 20, 2004 Address of Pope John Paul II part 6 [as to the obligation for others to give support to these families]; Attachment 2, questions 7, 8.)
The Magisterium and Catholic Authority
The statement of the Congregation for the Doctrine of the Faith is the expression of the highest teaching authority of the Catholic Church on matters of faith and morals, its Magisterium. All the Church’s members are to adhere to its pronouncement on matters of faith or morals, including Bishops. Cardinal Raymond Burke, formerly of St. Louis, Missouri, is the head or Prefect of the Church’s supreme court, called the “Supreme Tribunal of the Apostolic Signatura.” He recently reminded Catholics and Bishops of the authority of the Magisterium and the source of its authority:
“The Magisterium, in obedience to Christ and by the power of the particular grace of the Holy Spirit, interprets the Word of God, contained in the Sacred Scriptures and Tradition, in matters of both faith and morals. The Roman Pontiff and the Bishops in communion with him define the dogmas of the faith, that is, the truths contained in the deposit of faith and ‘truths having a necessary connection with these’ ” {Obedience to The Magisterium and the Responsibility of the Bishop Toward the Laity, quot *465 ing Magisterium of the Church, Catechism of the Catholic Church no. 88 [2d ed]).
“With regard to morals, the Magisterium presents faithfully the Decalogue and the requirements of the life of the virtues. The teaching office would fail in its God-given mission, if it did not apply the living Tradition to the circumstances of daily life in Christ. The Venerable Pope John Paul II exhorted Bishops to exercise the Magisterium regarding the moral life . . .
“The response of both Bishop and the faithful to the exercise of the teaching authority of Christ is obedience . . .
“The obedience of faith obliges us in all situations of life, also in situations in which it is most difficult to do what God asks of us. Ultimately, the obedience of faith could require martyrdom. In his Encyclical Letter Veritatis splendor, ‘Regarding Certain Fundamental Questions of the Church’s Moral Teaching’ of August 6, 1993, our late and most beloved Holy Father Pope John Paul II taught us that there can be no compromise in the obedience to the moral teaching of the Magisterium:
“ ‘Even in the most difficult situations man must respect the norm of morality so that he can be obedient to God’s holy commandments and consistent with his own dignity as a person. Certainly, maintaining a harmony between freedom and truth occasionally demands uncommon sacrifices, and must be won at a high price: it can even involve martyrdom (n. 102a)’.” (Id.; also see Catechism of the Catholic Church nos. 85, 93, 100 [requiring adherence], 2036 [Catholics required to observe natural law], 2037 [duty to observe the Catholic Constitute and decrees conveyed by the legitimate authority of the Church], 2052 [Church has right to announce moral principles, including those pertaining to the social order to the extent that they are required by the fundamental rights of the human person].)
Confusion of Authoritative Catholic Religious Beliefs
Under this statute the finders of fact and surrogates, in ascertaining the Catholic’s beliefs as applicable to a particular medical condition, may encounter, and should be alerted to, various groups or persons improperly contesting the authority *466 of the Magisterium, or the Catholic Church’s official position or its doctrines, and claiming a right to declare principles in opposition to or inconsistent therewith:
“Often the lack of obedience to the Magisterium is not total but selective. Our culture teaches us to believe what is convenient and to reject what is difficult for us or challenges us. Thus, we can easily fall into ‘cafeteria Catholicism,’ a practice of the faith, which picks and chooses what part of the deposit of faith to believe and practice. A most tragic example of the lack of obedience of faith, also on the part of certain Bishops, was the response of many to the Encyclical Letter Humanae vitae of Pope Paul VI, published on July 25, 1968. The confusion which resulted has led many Catholics into habits of sin in what pertains to the procreation and education of human life.” (Cardinal Burke, Obedience to The Magisterium and the Responsibility of the Bishop Toward the Laity, see also William E. May et al., Charles E. Curran’s Grossly Inaccurate Attack on the Moral Theology of John Paul II [June 14, 2005].)
It is noted that one of the children here, after consultation with a priest, believed that the blanket directive to prohibit food and water from his mother when she became unable to take food orally regardless of her medical condition was consistent with Catholic principles. (Transcript of Sept. 2, 2010 colloquy.) It is not clear whether he misunderstood, misapplied, or was misadvised. Nevertheless, it points out the need for the guardian/surrogate under the statute for vigilance to search out proper authority well trained in Catholic moral theology in determining their charge’s religious beliefs to be applied to the applicable medical situation. Also the failure of the “medical and social team” here to consider, and not even mention, the patient’s statement to her nurse that if she became unable to take food orally, she wished to receive artificially administered food and water, may reflect the bias in parts of the medical community against the previous presumption of life and in favor of the quality of life ethic noted by some writers. (See Burke J. Balch citations herein.) One of the most prominent advocates locally of the MOLST and the quality of life ethic as promoted in the living will is employed by a health care insurance provider, suggesting a conflict of interest in cost motivation, and another is a known advocate. In Vacco v Quill (521 US 793 [1997]), the Supreme Court ruled that the challenged New York *467 statute prohibiting physician-assisted suicide was valid, and physicians may not so cause, hasten, or aid a patient’s death. In contrast to the standard living will, which is being widely promoted, the Catholic Church has developed its own directives and a Catholic living will for Catholics and those whose religious beliefs are consistent with the Church’s view of the natural law application to end of life care and treatment.
Based on Natural Law
The Magisterium’s determinations are based on the natural law: “ ‘no one can arbitrarily choose whether to live or to die; the absolute master of such a decision is the Creator alone’ (n. 47).” (May, Caring for Persons in the “Persistent Vegetative State” and John Paul II’s March 20 2004 Address “On Life-Sustaining Treatments and the Vegetative State”, quoting Evangelium vitae by Pope John Paul II.)
“As Pope John Paul II reminded the Bishops, . . . the Magisterium includes also the precepts of the natural law written by God upon the human heart, the requirements of conduct inherent in man’s very nature and the order of the world, God’s creation. Obedience to the demands of the natural law is necessary for salvation, and, therefore, the teaching of the natural law is within the authority of the Magisterium and part of its solemn responsibility. ‘In recalling the prescriptions of the natural law, the Magisterium of the Church exercises an essential part of its prophetic office of proclaiming to men who they truly are and reminding them of what they should be before God’ ([Catechism of the Catholic Church no.] 2036).” (Cardinal Burke, Obedience to The Magisterium and the Responsibility of the Bishop Toward the Laity.)
“ ‘The rules that the Church sets forth reflect the divine Commandments, which find their crown and synthesis in the Gospel command of love. The end to which every divine rule tends is the greater good of human beings . . . Nor must we forget that the Ten Commandments have a firm foundation in human nature itself, and thus the values which they defend have universal validity. This is particularly true of values such as human life, which must be defended from conception until its end in natural death; the freedom of individuals and of nations, social justice and the structures needed to achieve it.’ (Pastores gregis, n. 29).” (Id.)
*468 “We must be wary of those who are too willing to end the lives of the elderly and the ill. If we ever decide that a poor quality of life justifies ending that life, we have taken a step down a slippery slope that places all of us in danger. There is a difference between allowing nature to take its course and actively assisting death. The call for euthanasia surfaces in our society periodically, as it is doing now under the guise of ‘death with dignity’ or assisted suicide. Euthanasia is a concept, it seems to me, that is in direct conflict with a religious and ethical tradition in which the human race is presented with ‘a blessing and a curse, life and death,’ and we are instructed ‘. . . therefore, to choose life.’ I believe ‘euthanasia’ lies outside the commonly held life-centered values of the West and cannot be allowed without incurring great social and personal tragedy. This is not merely an intellectual conundrum. This issue involves actual human beings at risk” (C. Everett Koop, M.D., Koop, The Memoirs of America’s Family Doctor [Random House, 1991]; see also Manhattan Declaration: A Call of Christian Conscience [drafted Oct., 20, 2009]; Catechism of the Catholic Church, part 3, § 1, ch 3 [“God’s Salvation: Law and Grace”], art 1 [“The Natural Moral Law”] nos. 1954-1960; § 2, ch 2, art 5 [“The Fifth Commandment”], “Intentional homicide” at nos. 2268-2269, “Euthanasia” at nos. 2276-2279, “Suicide” at nos. 2280-2283; “In Brief’ at nos. 2318-2321, 2324-2325).
Likewise, Pope John Paul II, who lived to see firsthand the extension of the arrogant assumption of authority to terminate “lives not worthy to be lived,” for compassionate purposes in the German Republic extended to the eugenic purpose of the “Master race” and “the final solution by the Nazi regime, warned in his March 20, 2004 Address:
“Moreover, to admit that decisions regarding man’s life can be based on the external acknowledgment of its quality, is the same as acknowledging that increasing and decreasing levels of quality of life, and therefore of human dignity, can be attributed from an external perspective to any subject, thus introducing into social relations a discriminatory and eugenic principle.” (Part 5.)
*469 Food and Water is Basic or Comfort Care and Differs from “Medical Treatment”
The Catholic Church considers food and water administered by artificial means to be basic health care mandated for sick people, even those in a vegetative state, including advanced Alzheimer’s, and as aforesaid, food taken orally is so recognized in the statute and excluded from the statute’s reach. The obligation to provide basic health care according to Catholic religious beliefs was stated by Pope John Paul II in his March 20, 2004 Address:
“The sick person in a vegetative state, awaiting recovery or a natural end, still has the right to basic health care (nutrition, hydration, cleanliness, warmth, etc.), and to the prevention of complications related to his confinement to bed. He also has the right to appropriate rehabilitative care and to be monitored for clinical signs of eventual recovery.
“I should like particularly to underline how the administration of water and food, even when provided by artificial means, always represents a natural means of preserving life, not a medical act. Its use, furthermore, should be considered, in principle, ordinary and proportionate, and as such morally obligatory, insofar as and until it is seen to have attained its proper finality, which in the present case consists in providing nourishment to the patient and alleviation of his suffering.” (Part 4.)
Medical Treatment
Providing food and water, even artificially, is distinguished from “treatment,” such as resuscitation, respirator, dialysis, antibiotics, painkillers, etc. Different principles and medical conditions apply in which Catholics may not morally forgo ordinary care as opposed to “treatment.” The distinction is that the underlying condition, rather than the treatment, is causing the person to die, and the forgoing of the treatment is not the cause of death except for painkillers. (The application of the ordinary and extraordinary definitions of medical treatment for Catholics, and where they may be appropriately applied to avoid suicide for oneself or others, as well as the use of painkillers even though it results in one’s death, is governed by Declaration on Euthanasia promulgated by the Sacred Congregation for the Doctrine of the Faith on May 5, 1980; painkillers are dealt with in parts II [“Euthanasia”] and III [“The Meaning of Suf *470 fering for Christians and the Use of Painkillers”] [signed by Franjo Cardinal Seper, as Prefect, and Jerome Hamer, O.P, Tit. Archbishop of Lorium, as Secretary].)
Caring Not Killing
The most important distinction of the Catholic Church from the statute’s standards for forgoing food and water is that the Catholic Church and other like-minded churches and pro-life organizations refuse to decouple food and water from the underlying condition. They believe that such decoupling constitutes a quality of life ethic, causing death by starvation and not by the underlying condition, i.e., not in spite of the “treatment” but because of it. The Catholic Church fears such decoupling from a condition of imminent death and death administering omission of food and water will open this euthanasia door even wider for “Mercy Killing” and assisted suicide, despite statutory language and protestations in the statute to the contrary. (Also see Matter of Edna M.F., 210 Wis 2d at 568-569, 563 NW2d at 490 [“We decline to go down this slippery slope (of euthanasia)”].)
Dangers
Quality of Life Ethic
Given the subjective nature of interpreting the statute’s generally undefined terms of “extraordinarily burdensome,” or an “extraordinary burden,” or the difficulty in medically prognosticating a six-month life expectancy (which becomes self-fulfilling), coupled with an “irreversible or incurable condition,” or “permanent[ ] unconsciousness]” from which the patient is not imminently dying lends itself to the great danger and likelihood of a resulting further extended quality of life ethic. Also, added to that subjective interpretation is the concept of “futile care” by which doctors and or institutions may override the patient’s clear direction for artificially administered food and water, and deny the same. That concern was expressed by the National Catholic Partnership on Disability Board in its August 22, 2008 Statement on “Futile Care” (available at http:// www.ncpd.org/policy/church/ncpd/statements/futilecare) as follows:
“The use of the term ‘futile care’ generally refers to the claim that ‘Physicians are not ethically obligated to deliver care that, in their best professional *471 judgment, will not have a reasonable chance of benefiting their patients.’ [footnote 5: ‘AMA Opinion E-2.035 “Futile Care,” available at http://www.amaassn.org/ama/pub/category/2830.html (last visited Dec. 5, 2007). Though the term “futile care” generally refers to medical treatment, it has also been used to justify the withdrawal of food and hydration, whether or not artificially supplied, which official Catholic teaching considers, not a medical act, but rather ordinary and proportionate care . . .’]. Unfortunately, there is no agreement within the medical community as to when such interventions lack sufficient benefit to be judged futile. For example, ‘[s]ome physicians use “futile” narrowly, considering treatments to be futile if they would be physiologically ineffective or would fail to postpone death. . . . Many [other] physicians embrace a broader, more elastic understanding of the term. . . . [A] treatment might be seen as futile if it does not offer what [these] physicians consider an acceptable quality of life.’ [footnote 6: ‘ “Will Your Advance Directive Be Followed?”, Robert Powell Center for Medical Ethics of the National Right to Life Committee, 5 (May 20, 2007) (quoting the New York State Task Force on Life and the Law, “When Others Must Choose: Deciding for Patients Without Capacity” (New York: n.p., 1992, pp. 196-97), available at http://www.nrlc.org/euthanasia/ AdvanceDirectives/ReportRevised2007.pdf (last visited Nov. 5, 2007)’; see also footnote 68: ‘See “Concerns about Decisions Related to Withholding/ Withdrawing Life-sustaining Treatment and Futility for Persons with Disabilities” (literature review concluding that “futile care” may prove a greater threat to disabled people than the legalization of assisted suicide), supra note 65 (“Furthermore, providers may share the negative attitudes pervasive in society about the quality of disabled people’s lives that in turn can influence their decisions whether to withdraw life support. See generally, Werth, James L., Jr., ‘Concerns about Decisions Related to Withholding/Withdrawing Life-sustaining Treatment and Futility for Persons with Disabilities,’ Journal of Disability Policy Studies [16:1, June 22, 2005]. Cf. Stith, Mar ah, ‘The Semblance of Autonomy: Treatment of Persons with Disabilities *472 under the Uniform Health-Decisions Act,’ 22 Issues L. & Med. 39, 60-61 [Summer, 2006]”)’].”
In Mrs. Zornow’s case the “team” agreed to and enacted a MOLST directive, without authority, which was in violation of her religious belief and her 2002 statement, in which she requested artificially administered nourishment. The MOLST further declared: “no hospitalization unless pain or severe symptoms cannot be otherwise controlled,” signed September 15 and September 18, 2009. The “team” directive also stated “no hospitalization,” and number 8 stated, “No appropriate decision maker is available. (Go to sec.2B: Medical Futility). Dated Sept 5, 2009.” (Exhibit C attached to Jennifer N. Weidner, Esq.’s affidavit sworn to on Septemberl4, 2010.)
Blanket Directives Not Practical for Catholics
This difference in definitions of words such as ordinary, extraordinary, burden, treatment versus care etc., as well as its different definition in different medical conditions between the statute and Catholic doctrine does not lend itself to blanket directives without creating serious difficulties, and should be avoided in lieu of detailed specification to the exact condition to be addressed and the Catholic principles applicable to that particular situation. The second problem is that when a medical situation arises or circumstances occur where the family may elect to forgo the treatment or care, or to continue it, they are deprived of that opportunity because the medical directive MOLST directs the result without any prior consultations built in.
“Make certain that your Advance Directive forbids any action that the Catholic faith considers to be immoral, such as euthanasia or physician-assisted suicide. . . .
“The usefulness of an Advance Directive, which gives specific instructions for care, is limited because of its inflexibility. If circumstances change significantly between writing the Advance Directive and its implementation, the instructions may be of little value to those acting on a patient’s behalf, or may even hinder their freedom to make good decisions. There may also be a problem of interpreting the document when it is not clearly written. An Advance Directive oftentimes does not allow for adequate informed consent because one must make a decision about a future medical condition which cannot be *473 known in advance. When drawing up an Advance Directive, therefore, one should focus on general goals rather than on specific medical procedures.” (National Catholic Bioethics Center, A Catholic Guide to End-of-Life Decisions [containing also a health care proxy for Catholics as well as an advance medical directive consistent with Catholic religious and moral beliefs, revised 2005; note these documents, although apparently consistent with the 2007 declaration on nutrition and hydration, have not been updated].)
Mercy Killing and Assisted Suicide Proponents
This progression of the statute’s “quality of life” ethic is clearly being promoted openly into further mercy killing through assisted suicide by organizations such as Compassion and Choices (C & C) and Compassion and Choices of New York (C & C of NY), stridently pro-euthanasia organizations, formerly known as the Hemlock Society. They have already embarked on efforts to force Catholics and Catholic health care organizations under the statute’s current standards to participate in the quality of life practice by starvation under sedation in violation of and against Catholics and others’ most serious and grievous religious beliefs, and their rights of conscience and religious freedom. They are developing a long-term national strategy. (C & C of NY, Consumers of Catholic healthcare, be aware [spring 2010 newsletter]; C & C, How the opinion of one pope became the rule for all Americans [Jan. 2010]; see also C & C, Catholic Ethical and Religious Directives [Sept. 2010] [suggesting Directives language to counter Catholic beliefs]; C & C, Catholic Bishops Enact Plan for 300,000 Terri Schiavos and Council of Catholic Bishops Veto Millions of Advance Directives [Nov. 2009].)
Interestingly, the second condition of the FHCDA allowing termination of food and water to kill patients with a six-month life expectancy has already been extended, with the applause of the Compassion and Choice groups, including C & C of NY, into lethal injections: “The (Washington) law allows terminally ill adults who have been told by their doctors that they have six months or less to live to ask for a prescription for lethal medication.” The group and its allied organizations as a ploy to further their assisted suicide efforts reject the use of the word “suicide” or “physician assisted suicide” when promoting it, and claim that the doctor-assisted suicides will bring into the *474 open the “back alley” terminations of life, inferring that such termination of lives is secretly occurring in states where such conduct violates their medical ethics and the law. (See C & C of NY, autumn 2008 and spring 2010 newsletters; C & C October 2010 newsletter.)
“Denial of food and fluids to people who cannot speak for themselves has been going on for fifteen years in this country. It is routine practice in hospitals and nursing homes across the country. And for over a decade, the law on this, established by numerous court decisions and statutes, has been largely settled. If someone who is now incompetent to make health care decisions has not left clear instructions in a legal document (variously called an ‘advance directive,’ ‘durable power of attorney for health care,’ ‘living will,’ or the like), then a surrogate decision-maker can legally decide to cut off the person’s food and fluids. . . .
“It should come as no surprise that, with important exceptions, the prevailing view in the judiciary, as in the medical profession, is receptive to the quality of life ethic. Judges are often dismissive of our position that all human beings possess dignity and the right to live, regardless of their age or degree of disability. When the relative or other individual designated by state law to make health care decisions for an incompetent person who has left no clear advance directive chooses to cut off food and fluids, courts are rarely willing to agree with other relatives who seek to overturn that decision.
“Indeed, the current battleground is over efforts by health care personnel to cut off food, fluid and lifesaving treatments from patients they think have a poor quality of life AGAINST THE WISHES of the patient and family. A large body of medical and ethical opinion holds that even when there is no doubt that a patient wants to live, or when family members are united in saying the patient should get lifesaving treatment, doctors and hospitals should be able to say no.” (Burke J. Balch, J.D. [Director of Robert Powell Center for Medical Ethics], New York State Right to Life Will to Live Project, Commentary: Case Points up Urgency of Will to Live.)
*475 Catholic Decision Makers and Those Implementing It
The potential question earlier raised, but not reached, is if a Catholic or non-Catholic determines to forgo water and food administered artificially in situations of legally allowed euthanasia under the statute or law, but morally disallowed for Catholics, may any Catholic, especially Catholic surrogates and Catholic health care providers etc., make or implement such decisions? The Sacred Congregation for the Doctrine of the Faith’s Declaration on Euthanasia adopted May 5, 1980 states:
“EUTHANASIA . . .
“It is, therefore, necessary to state clearly in what sense the word [euthanasia] is used in the present document [i.e. 1980 Declaration on Euthanasia], By euthanasia is understood an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated. Euthanasia’s terms of reference, therefore, are to be found in the intention of the will and in the methods used. It is necessary to state firmly once more that nothing and no one can in any way permit the killing of an innocent human being, whether an infant or an adult, an old person, or one suffering from an incurable disease, or a person who is dying. . . . [N]o one is permitted to ask for this act of killing, either for himself or herself or for another person entrusted to his or her care, nor can he or she consent to it, either explicitly or implicitly. Nor can any authority legitimately recommend or permit such an action. For it is a question of the violation of the divine law, an offense against the dignity of the human person, a crime against life, and an attack on humanity.”
Pope John Paul II in his March 20, 2004 Address (part 4) reaffirmed and emphasized that declaration:
“Death by starvation or dehydration is, in fact, the only possible outcome as a result of their [food and water] withdrawal. In this sense it ends up becoming, if done knowingly and willingly, true and proper euthanasia by omission.
“In this regard, I recall what I wrote in the Encyclical Evangelium Vitae, making it clear that ‘by euthanasia in the true and proper sense must be understood an action or omission which by its very nature and intention brings about death, with the purpose *476 of eliminating all pain’; such an act is always ‘a serious violation of the law of God, since it is the deliberate and morally unacceptable killing of a human person’ (n. 65).”
Use of Authoritative Documents
The court has taken into account the authoritative laws and rules of the Catholic Church on faith and morals promulgated and made public, including the Code of Canons of the Eastern Churches promulgated by Pope John II in 1990; the Catechism of the Catholic Church (2d edition), which Latin version was promulgated by Pope John Paul II on August 25, 1997; Apostolic Constitution Fidei Depositum part IV (Catechism of the Catholic Church nos. 84, 2037); and Apostolic Letter Laetamur Magnopere. In the latter document, the Catechism is identified as a sure and authentic reference text, a genuine presentation of the faith, and a totally reliable way to present Catholic doctrine (at 4-6, no. 10): The Magisterium’s teachings on faith and morals are declared and promulgated by the Sacred Congregation for the Doctrine of the Faith, to which the court also makes reference, including the 1980 Declaration on Euthanasia, the August 2007 Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration, and its accompanying commentary approved by the Cardinal and the Bishops of the Congregation. Further, many of the documents quoted from or referenced herein often identify these authoritative sources as the basis of their and the Catholic Church’s positions.
Legislation Suggestion
The court would suggest legislative action by revising the FHCDA design to set forth the “sanctity of life” as the main ethic, and allowing the limited “quality of life” ethic to be specifically limited to those who so personally indicate under the level of proof required by the O’Connor case, and not beyond the threshold of the Edna M.F. case.
Justice Ritholtz in Borenstein (8 Misc 3d at 501) warned: “We must never forget that, when the quality of life replaces the sanctity of life, society has done itself irreparable harm.” (Citation and internal quotation marks omitted.)
This court would add the words of John Donne:
“But who can remove [his hearing] from that bell, which is passing a piece of himself [mankind] out of this world?
*477 “No man is an island, entire of itself . . . [A]ny man’s death diminishes me, because I am involved in mankind, and therefore never send to know for whom the bell tolls; it tolls for thee.” (Meditation 17.)
Attachment 1
United States Conference of Catholic Bishops, Pro-Life Activities, Commentary on Nutrition and Hydration (approved by the Cardinal and Bishop members of the Congregation for the Doctrine of Faith released on September 15, 2007 [available at http://www.nccbuscc.org/prolife/tdocs/anhcommentary.shtml]) (“Therefore, the Responses [to Certain Questions Concerning Artificial Hydration and Nutrition (available at http:// www.usccb.org/prolife/tdocs/anhresponses.shtml)] now given by the Congregation for the Doctrine of the Faith continue the direction of the documents of the Holy See cited above, and in particular the Address of John Paul II of March 20, 2004 [available at http://www.vatican.va/holy_father/johnjpaul_ii/speeches/ 2004/march/documents/hfJp-ii_spe_20040320_congress-fiamc_en.html] ”).
“The Congregation for the Doctrine of the Faith has formulated responses to questions presented by His Excellency the Most Reverend William S. Skylstad, President of the United States Conference of Catholic Bishops, in a letter of July 11, 2005, regarding the nutrition and hydration of patients in the condition commonly called a ‘vegetative state’. The object of the questions was whether the nutrition and hydration of such patients, especially if provided by artificial means, would constitute an excessively heavy burden for the patients, for their relatives, or for the health-care system, to the point where it could be considered, also in the light of the moral teaching of the Church, a means that is extraordinary or disproportionate and therefore not morally obligatory.
“The Address of Pope Pius XII to a Congress on Anesthesiology, given on November 24, 1957, is often invoked in favor of the possibility of abandoning the nutrition and hydration of such patients. In this address, the Pope restated two general ethical principles. On the one hand, natural reason and Christian morality teach that, in the case of a grave illness, the patient and those caring for him or her *478 have the right and the duty to provide the care necessary to preserve health and life. On the other hand, this duty in general includes only the use of those means which, considering all the circumstances, are ordinary, that is to say, which do not impose an extraordinary burden on the patient or on others. A more severe obligation would be too burdensome for the majority of persons and would make it too difficult to attain more important goods. Life, health and all temporal activities are subordinate to spiritual ends. Naturally, one is not forbidden to do more than is strictly obligatory to preserve life and health, on condition that one does not neglect more important duties.
“One should note, first of all, that the answers given by Pius XII referred to the use and interruption of techniques of resuscitation. However, the case in question has nothing to do with such techniques. Patients in a ‘vegetative state’ breathe spontaneously, digest food naturally, carry on other metabolic functions, and are in a stable situation. But they are not able to feed themselves, [footnote 1: ‘Terminology concerning the different phases and forms of the “vegetative state” continues to be discussed, but this is not important for the moral judgment involved.’] If they are not provided artificially with food and liquids, they will die, and the cause of their death will be neither an illness nor the ‘vegetative state’ itself, but solely starvation and dehydration. At the same time, the artificial administration of water and food generally does not impose a heavy burden either on the patient or on his or her relatives. It does not involve excessive expense; it is within the capacity of an average healthcare system, does not of itself require hospitalization, and is proportionate to accomplishing its purpose, which is to keep the patient from dying of starvation and dehydration. It is not, nor is it meant to be, a treatment that cures the patient, but is rather ordinary care aimed at the preservation of life.
“What may become a notable burden is when the ‘vegetative state’ of a family member is prolonged over time. It is a burden like that of caring for a quadriplegic, someone with serious mental illness, with advanced Alzheimer’s disease, and so on. Such persons need continuous assistance for months or *479 even for years. But the principle formulated by Pius XII cannot, for obvious reasons, be interpreted as meaning that in such cases those patients, whose ordinary care imposes a real burden on their families, may licitly be left to take care of themselves and thus abandoned to die. This is not the sense in which Pius XII spoke of extraordinary means.
“Everything leads to the conclusion that the first part of the principle enunciated by Pius XII should be applied to patients in a Vegetative state’: in the case of a serious illness, there is the right and the duty to provide the care necessary for preserving health and life. The development of the teaching of the Church’s Magisterium, which has closely followed the progress of medicine and the questions which this has raised, fully confirms this conclusion.
“The Declaration on Euthanasia, published by the Congregation for the Doctrine of the Faith on May 5, 1980, explained the distinction between proportionate and disproportionate means, and between therapeutic treatments and the normal care due to the sick person: ‘When inevitable death is imminent in spite of the means used, it is permitted in conscience to take the decision to refuse forms of treatment that would only secure a precarious and burdensome prolongation of life, so long as the normal care due to the sick person in similar cases is not interrupted’ (Part IV). Still less can one interrupt the ordinary means of care for patients who are not facing an imminent death, as is generally the case of those in a Vegetative state’; for these people, it would be precisely the interruption of the ordinary means of care which would be the cause of their death.
“On June 27, 1981, the Pontifical Council Cor Unum published a document entitled Some Ethical Questions Relating to the Gravely III and the Dying, in which, among other things, it is stated that ‘There remains the strict obligation to administer at all costs those means which are called “minimal”: that is, those that normally and in usual conditions are aimed at maintaining life (nourishment, blood transfusions, injections, etc.). The discontinuation of these minimal measures would mean in effect willing the end of the patient’s life’ (no. 2.4.4.).
*480 “In an Address to participants in an international course on forms of human preleukemia on November 15, 1985, Pope John Paul II, recalling the Declaration on Euthanasia, stated clearly that, in virtue of the principle of proportionate care, one may not relinquish ‘the commitment to valid treatment for sustaining life nor assistance with the normal means of preserving life’, which certainly includes the administration of food and liquids. The Pope also noted that those omissions are not licit which are aimed ‘at shortening life in order to spare the patient or his family from suffering’.
“In 1995 the Pontifical Council for Pastoral Assistance to Health Care Workers published the Charter for Health Care Workers, paragraph 120 of which explicitly affirms: ‘The administration of food and liquids, even artificially, is part of the normal treatment always due to the patient when this is not burdensome for him or her; their undue interruption can have the meaning of real and true euthanasia’.
“The Address of John Paul II to a group of Bishops from the United States of America on visit ad limina, on October 2, 1998, is quite explicit: nutrition and hydration are to be considered as normal care and ordinary means for the preservation of life. It is not acceptable to interrupt them or to withhold them, if from that decision the death of the patient will follow. This would be euthanasia by omission (cf. no. 4).
“In his Address of March 20, 2004, to the participants of an International Congress on ‘Life-sustaining Treatments and the Vegetative State: scientific progress and ethical dilemmas’, John Paul II confirmed in very clear terms what had been said in the documents cited above, clarifying also their correct interpretation. The Pope stressed the following points:
“1. ‘The term permanent vegetative state has been coined to indicate the condition of those patients whose “vegetative state” continues for over a year. Actually, there is no different diagnosis that corresponds to such a definition, but only a conventional prognostic judgment, relative to the fact that the recovery of patients, statistically speaking, is *481 ever more difficult as the condition of vegetative state is prolonged in time’ (no. 2).
“2. In response to those who doubt the ‘human quality’ of patients in a ‘permanent vegetative state’, it is necessary to reaffirm that ‘the intrinsic value and personal dignity of every human being do not change, no matter what the concrete circumstances of his or her life. A man, even if seriously ill or disabled in the exercise of his highest functions, is and always will be a man, and he will never become a “vegetable” or an “animal” ’ (no. 3).
“3. ‘The sick person in a vegetative state, awaiting recovery or a natural end, still has the right to basic health care (nutrition, hydration, cleanliness, warmth, etc.), and to the prevention of complications related to his confinement to bed. He also has the right to appropriate rehabilitative care and to be monitored for clinical signs of possible recovery. I should like particularly to underline how the administration of water and food, even when provided by artificial means, always represents a natural means of preserving life, not a medical act. Its use, furthermore, should be considered, in principle, ordinary and proportionate, and as such morally obligatory, to the extent to which, and for as long as, it is shown to accomplish its proper finality, which in the present case consists in providing nourishment to the patient and alleviation of his suffering’ (no. 4).
“4. The preceding documents were taken up and interpreted in this way: ‘The obligation to provide the “normal care due to the sick in such cases” (Congregation for the Doctrine of the Faith, Declaration on Euthanasia, p. IV) includes, in fact, the use of nutrition and hydration (cf. Pontifical Council Cor Unum, Some Ethical Questions Relating to the Gravely III and the Dying, no. 2, 4, 4; Pontifical Council for Pastoral Assistance to Health Care Workers, Charter for Health Care Workers, no. 120). The evaluation of probabilities, founded on waning hopes for recovery when the vegetative state is prolonged beyond a year, cannot ethically justify the cessation or interruption of minimal care for the patient, including nutrition and hydration. Death by starvation or dehydration is, in fact, the only *482 possible outcome as a result of their withdrawal. In this sense it ends up becoming, if done knowingly and willingly, true and proper euthanasia by omission’ (n. 4).
“Therefore, the Responses now given by the Congregation for the Doctrine of the Faith continue the direction of the documents of the Holy See cited above and in particular the Address of John Paul II of March 20, 2004. The basic points are two. It is stated, first of all, that the provision of water and food, even by artificial means, is in principle an ordinary and proportionate means of preserving life for patients in a ‘vegetative state’: ‘It is therefore obligatory, to the extent to which, and for as long as, it is shown to accomplish its proper finality, which is the hydration and nourishment of the patient’. It is made clear, secondly, that this ordinary means of sustaining life is to be provided also to those in a ‘permanent vegetative state’, since these are persons with their fundamental human dignity. “When stating that the administration of food and water is morally obligatory in principle, the Congregation for the Doctrine of the Faith does not exclude the possibility that, in very remote places or in situations of extreme poverty, the artificial provision of food and water may be physically impossible, and then ad impossibilia nemo tenetur. However, the obligation to offer the minimal treatments that are available remains in place, as well as that of obtaining, if possible, the means necessary for an adequate support of life. Nor is the possibility excluded that, due to emerging complications, a patient may be unable to assimilate food and liquids, so that their provision becomes altogether useless. Finally, the possibility is not absolutely excluded that, in some rare cases, artificial nourishment and hydration may be excessively burdensome for the patient or may cause significant physical discomfort, for example resulting from complications in the use of the means employed.
“These exceptional cases, however, take nothing away from the general ethical criterion, according to which the provision of water and food, even by artificial means, always represents a natural means for preserving life, and are not a therapeutic treat- *483 merit. Its use should therefore be considered ordinary and proportionate, even when the ‘vegetative state’ is prolonged.”
Attachment 2
Q & A from the USCCB Committee on Doctrine and Committee on Pro-Life Activities regarding The Holy See’s Responses on Nutrition and Hydration for Patients in a “Vegetative State” (issued September 2007) (available at http://www.usccb.org/ comm/hydrationq&a.doc).
“In July 2005, the United States Conference of Catholic Bishops submitted two questions for clarification (in the form of a dubium) to the Congregation for the Doctrine of the Faith about the meaning of the Address (available at http:// www.vatican.va/holy_father/john_paul_ii/speeches/ 2004/march/documents/hfjp-ii_spe_20040320_ congress-fiamc_en.html) given on March 20, 2004 by Pope John Paul II to a Rome conference on patients diagnosed as being in a ‘vegetative state;’ [footnote 1: ‘As noted in the Holy Father’s Address, the term “vegetative state” is commonly used in medical practice but may unfortunately mislead some to think that patients in this state lack full human dignity; therefore it is cited in this text only with quotation marks. The Holy Father also noted in 2004 that there is confusion and disagreement among medical experts about the definition of the “vegetative state” and its diagnosis, and about the parameters for judging when to call such a state “persistent” or “permanent” (with the former term more often used in the United States).’] The Congregation responded to these questions in September 2007. The Responses (approved by Pope Benedict XVI) and a Commentary (approved by the Cardinal and Bishop members of the Congregation) will be publicly released on September 15 in L’Osservatore Romano. Following are questions and answers about these texts.
“1) What do the Responses say?
“They reaffirm two central teachings in Pope John Paul II’s Address of 2004: 1) Patients who are in a ‘vegetative state’ are still living human beings with inherent dignity, deserving the same basic care as other patients; and 2) nutrition and hydration, even *484 when provided with artificial assistance, is generally part of that normal care owed to patients in this state, along with other basic necessities such as the provision of warmth and cleanliness.
“2) Does this represent a change in Church teaching?
“No. These Responses reaffirm what was taught by Pope John Paul II in his 2004 Address, which itself is in continuity with the Holy See’s Declaration on Euthanasia of 1980 and other documents regarding the right of patients to receive normal or basic care. As the Commentary points out, in developing this teaching, the Church’s Magisterium has paid close attention to ‘the progress of medicine and the questions which this has raised.’
“3) The Church has long taught that one is not obliged to employ extraordinary or disproportionate means to preserve one’s life. Does this traditional form of reasoning not apply in the case of the person in a persistent Vegetative state’?
“This form of reasoning does apply. However, for modern societies with advanced medical services the administration of nutrition and hydration by artificial means to patients in a ‘vegetative state’ who need such assistance to survive is generally neither extraordinary nor disproportionate.
“To apply this reasoning correctly we must recognize that all human life, not only a particular kind of life we might consider ‘normal’ or ‘productive,’ is precious and should be preserved. Those in a ‘vegetative state’ suffer from a very severe disability, but they do not lose their human dignity. In this respect, as Pope John Paul II pointed out in his Address, even the term ‘vegetative state’ is unfortunate and potentially misleading — a human being must never be dismissed as having the status of a ‘vegetable.’
“4) Are there medical situations in which it is moral to withhold nutrition and hydration?
“Yes. For example, a patient in the last stages of stomach cancer is already dying from that condition. Such a dying patient, or others who can speak for the patient, may decide to refuse further feeding because it causes pain and gives little benefit. The *485 administration of nutrition and hydration in this case would pose a burden on the stomach cancer patient that is disproportionate to its benefit. By contrast, the ‘vegetative state’ is not in itself a case of imminent dying, and the reception of nutrition and hydration itself does not generally constitute a burden for him or her.
“5) Are there possible cases when it would be moral to withhold or withdraw nutrition and hydration from the patient in a ‘vegetative state’?
“Yes. They could be withheld if the available means for administering nutrition and hydration were not effective in providing the patient with nourishment (for example, because the patient can no longer assimilate these), or if the means itself constituted a burden (for example, because the feeding tube is for some reason causing persistent infections). The Commentary notes that such situations are rare. It also notes that the obligation to provide artificially assisted food and fluids may not bind in situations of extreme poverty or in the absence of a modern health care system, because one is not held to do what is impossible.
“6) May nutrition and hydration be withheld from patients in a persistent ‘vegetative state’ because prolonged care for them may involve significant costs?
“No, because in technologically advanced societies the costs directly attributable to the administration of nutrition and hydration are generally not excessive. To be sure, the costs and other burdens placed on families by the patient’s need for prolonged care may become very significant; However, this real problem must not be resolved by removing basic care so the patient will die. While one may act to reduce or remove a burden caused directly by the administration of nutrition and hydration if the benefit is not proportionate to the burden, we must not dismiss life itself as a burden even when its helpless state may call on us for other forms of care. To act to end life because life itself is seen as a burden, or imposes an obligation of care on others, would be euthanasia.
*486 “7) Who should bear the burdens associated with providing proper care for those in a persistent ‘vegetative state’?
“Pope John Paul II insisted that families ‘cannot be left alone with their heavy human, psychological and financial burden.’ He maintained that ‘society must allot sufficient resources for the care of this sort of frailty’ and suggested a range of initiatives to provide assistance (see Address, no. 6). The Church likewise has an obligation to offer what assistance she can, which might involve stepping in where the support from society falls short, as well as providing the spiritual and pastoral aid that only she can give. This is an opportunity for the Church to bear witness to her commitment to serve human life from conception to natural death.
“8) Could proper care for those in a persistent ‘vegetative state’ impose significant financial burdens on Catholic health care facilities?
“Yes, in the case of families who have limited financial means and no or insufficient health insurance. Catholic health care facilities recognize that at times they are obliged to bear the cost of providing health care to those who cannot pay for it. In the loving care that they provide to such persons, with the assistance of the entire Catholic community, they can provide concrete examples of the Church’s commitment to human life.
“9) Are the Ethical and Religious Directives for Catholic Health Care Services in conformity with this teaching?
“Directive 58 already speaks of ‘a presumption in favor of providing nutrition and hydration to all patients, including patients who require medically assisted nutrition and hydration.’ The Address and the Responses clarify how this presumption applies to the patient in a ‘vegetative state’ as to other patients, and provide further guidance as to how the Directives should be interpreted and implemented.”
Note: as to question 9 above Directive 58 in the Ethical and Religious Directives for Catholic Health Care Services was modified in the 2009 fifth edition from a “presumption” to an “obligation” to provide artificially administered food and water as comfort care in accordance with the 2007 clarification by the Sacred Congregation for the Doctrine of the Faith.
*487 Attachment 3
United States Conference of Catholic Bishops, Pro-Life Activities, Appendix, Technical Aspects of MedicallyAssisted Nutrition and Hydration (approved by the Cardinal and Bishop members of the Congregation for the Doctrine of Faith released on September 15, 2007 (available at http://www.nccbuscc.org/ prolife/issues/euthanas/nutend.shtmlhttp://www.nccbuscc.org/ prolife/tdocs/anhcommentary. shtml).
“Procedures for providing nourishment and fluids to patients who cannot swallow food orally are either ‘parenteral’ (bypassing the digestive tract) or ‘enteral’ (using the digestive tract).
“Parenteral or intravenous feeding is generally considered ‘more hazardous and more expensive’ than enteral feeding. [Footnote 42: ‘David Major, M.D., “The Medical Procedures for Providing Food and Water: Indications and Effects,” in Lynn (ed.), By No Extraordinary Means (Indiana University Press 1986) (hereinafter “Major”), page 27.’] It can be subdivided into peripheral intravenous feeding (using a needle inserted into a peripheral vein) and central intravenous feeding, also known as total parenteral feeding or hyperalimentation (using a larger needle inserted into a central vein near the heart). Peripheral intravenous lines can provide fluids and electrolytes as well as some nutrients; they can maintain fluid balance and prevent dehydration, but cannot provide adequate nutrition in the long term. [Footnote 43: ‘Peripheral veins (e.g., those found in the arm or leg) will eventually collapse after a period of intravenous feeding, and will collapse much faster if complex nutrients such as proteins are included in the formula. See U.S. Congress, Office of Technology Assessment, Life-Sustaining Technologies and the Elderly, OTA-BA-306 (Washington, D.C.: U.S. Government Printing Office, July 1987) hereinafter “OTA”), pages 283-4.’] Total parenteral feeding can provide a more adequate nutritional balance, but poses significant risks to the patient and may involve costs an order of magnitude higher than other methods of tube feeding. It is no longer considered experimental, and has become ‘a mainstay for helping critically ill patients to survive acute illnesses where the prognosis had previously been nearly hopeless,’ but its fea *488 sibility for life-long maintenance of patients without a functioning gastrointestinal tract has been questioned. [Footnote 44: ‘Major, pages 22, 24-5. Also see OTA, pages 284-6.’]
“Because of the limited usefulness of peripheral intravenous feeding and the special burdens of total parenteral feeding — and because few patients so completely lack a digestive system that they must depend on these measures for their sole source of nutrition — enteral tube feeding is the focus of the current debate over medically assisted nutrition and hydration. Such methods are used when a patient has a functioning digestive system but is unable or unwilling to ingest food orally and/or to swallow. The most common routes for enteral tube feeding are nasogastric (introducing a thin plastic tube through the nasal cavity to reach into the stomach), gastrostomy (surgical insertion of a tube through the abdominal wall into the stomach), and jejunostomy (surgical insertion of a tube through the abdominal wall into the small intestine). [Footnote 45: ‘See Major, pages 22, 25-6.’] These methods are the primary focus of this document.
“Each method of enteral tube feeding has potential side-effects. For example, nasogastric tubes must be inserted and monitored carefully so they will not introduce food or fluids into the lungs. They may also irritate sensitive tissues and create discomfort; confused or angry patients may sometimes try to remove them, and efforts to restrain a patient to prevent this can impose additional discomfort and other burdens. On the positive side, insertion of these tubes requires no surgery and only a modicum of training. [Footnote 47: ‘Major, page 22; OTA, pages 282-3; Rose Laboratories, Tube Feedings: Clinical Application (L982), pages 28-30.’]
“Gastrostomy and jejunostomy tubes are better tolerated by many patients in need of long-term feeding. Their most serious physical burdens arise from the fact that their insertion requires surgery using local or general anesthesia, which involves some risk of infection and other complications. Once the surgical procedure is completed, these tubes can often be maintained without serious pain or medical complications, and confused patients do not often *489 attempt to remove them. [Footnote 48: ‘Major, page 22; OTA, page 282. Many ethicists observe that there is no morally significant difference in principle between withdrawing a life-sustaining procedure and failing to initiate it. However, surgically implanting a feeding tube and maintaining it once implanted may involve a different proportion of benefit to burden, because the transient risks of the initial surgical procedure will not continue or recur during routine maintenance of the tube.’] “Conclusion [http://www.usccb.org/prolife/issues/ euthanas/nutconc.shtml]
“Euthanasia Menu [http://www.usccb.org/prolife/ issues/euthanas/index.shtml].”